1   IGNACIA S. MORENO, Assistant Attorney General
    United States Department of Justice
2   Environment & Natural Resources Division

3   MARTIN F. McDERMOTT (SBN 6183307 (IL))
    United States Department of Justice
4   Environment & Natural Resources Division
    Environmental Defense Section
5   P.O. Box 23986
    Washington, D.C.  20026-3986
6   martin.mcdermott@usdoj.gov
    Tel: (202) 514-4122
7

8                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
9                       SAN FRANCISCO DIVISION

10  _____
                                        )
11  ALEC L., et al.,                    )
                                        )
12            Plaintiffs,               )        Case No.: 4:11-cv-02203 EMC
                                        )
13       v.                             )
                                        )        Date: November 28, 2011
14  LISA P. JACKSON, et al.,            )        Time: 2:30 p.m.
                                        )        Place: Courtroom 5, 17th Floor
15            Defendants.               )
    _____)

16              **MEMORANDUM IN SUPPORT OF**
               **DEFENDANTS' MOTION TO DISMISS**
17

18       Defendants Lisa P. Jackson in her official  capacity as Administrator of the U.S. Environmental

19  Protection Agency ("EPA"), Kenneth L. Salazar in his official capacity as Secretary of the U.S. Department

20  of the Interior ("DOI"), Thomas J. Vilsack in his official capacity as Secretary of the U.S. Department of

21  Agriculture ("USDA"), Gary F. Locke in his official capacity as Secretary of the U.S. Department of

22  Commerce ("Commerce"), Steven Chu in his official capacity as Secretary of the U.S. Department of

23  Energy ("DOE"), and Leon E. Panetta in his official capacity as Secretary of the U.S. Department of

24  Defense (DOD"), file this Memorandum in support of Defendants' Motion to Dismiss the First Amended

25  Complaint for Declaratory and Injunctive Relief (hereinafter the "Complaint," or "Cmplt.") (Doc. 4) filed

26  by Plaintiffs Alec L., Madeline W., Garrett and Grant S. and Zoe J. (by and through their guardians ad

27  litem), Kids vs Global Warming, and Wildearth Guardians ("Gaurdians" in Complaint's caption and text

28  (p. 13)).

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Public Trust Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.    General Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        2.    Allegations Directed Against The Agency Defendants . . . . . . . . . . . . . . 4

        3.    Claim for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        4.    Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            a.    Declaratory Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            b.    Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.    SUPREME COURT DECISIONS: *MASSACHUSETTS v. EPA; AMERICAN ELECTRIC POWER CO. v. CONNECTICUT* . . . . . . . . . . . . . . . . . 7

    D.    LEGAL STANDARDS FOR A MOTION TO DISMISS . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.    THE UNITED STATES HAS NOT WAIVED SOVEREIGN IMMUNITY HERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    II.    THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFFS' CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    III.    PLAINTIFFS LACK STANDING TO ASSERT THEIR FEDERAL COMMON LAW PUBLIC TRUST DOCTRINE CLAIM . . . . . . . . . . . . . . . . 15

        A.    Plaintiffs Lack Prudential Standing Because Their Claim Is Composed Of Generalized Grievances More Appropriately Addressed By The Legislative and Executive Branches . . . . . . . . . . . . 16

            1.    This Court should refrain from adjudicating generalized grievances like Plaintiffs' common law public trust claim . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.    Plaintiffs Lack Article III Standing Because Their Claim Is Not Redressable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    IV.    THE PUBLIC TRUST DOCTRINE DOES NOT SUPPLY A FEDERAL CAUSE OF ACTION AGAINST THE UNITED STATES AND, IN ANY EVENT, PLAINTIFFS' CLAIM DOES NOT FALL WITHIN THE BOUNDARIES OF THE DOCTRINE . . . . . . . . . . 22

V.    EVEN IF PLAINTIFFS COULD STATE A FEDERAL PUBLIC
      TRUST CLAIM, SUCH A CLAIM IS FORECLOSED BY THE
      CLEAN AIR ACT AND OTHER FEDERAL ENVIRONMENTAL
      AND RESOURCE STATUTES AND INITIATIVES . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## CASES

*A-Z Int'l v. Phillips*, 323 F.3d 1141 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Allen v. Wright*, 468 U.S. 737 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

*Am. Elec. Power Co. Inc. v. Connecticut*, 131 S. Ct. 2527 (2011) . . . . . . . . . . . . . . . 1, 8, 9, 10

*Am. Bus Ass'n v. Slater*, 231 F.3d 1 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Baker v. Carr*, 369 U.S. 186 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*City of Alameda v. Todd Shipyards Corp.*, 635 F. Supp. 1447 (N.D. Cal. 1986) . . . . . . . . . . . 23

*City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415 (3d Cir. 2002) . . . . . . . . . . . . . . 15

*Connecticut v. Am. Elec. Power Co. Inc.*, 582 F.3d 309 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . 8

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*,

    482 F.3d 1157 (9ᵗʰ Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d 1077 (D.C. Cir. 1984) . . . . . . . . . . . . . 2, 3, 24, 25

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004) . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Georgia v. Tenn. Copper Co.*, 206 U.S. 230 (1907) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hodge v. Dalton*, 107 F.3d 705 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ill. Cent. R.R. Co. v. Illinois*, 146 U.S. 387 (1892) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 23

*Illinois v. Milwaukee*, 406 U.S. 91 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lake Michigan Fed'n v. U.S. Army Corps of Eng'rs*, 742 F. Supp. 441 (N.D. Ill. 1990) . . . . . . . 3

*Light v. United States*, 220 U.S. 523 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 23

*Lujan v. Defenders of Wildlife*, 550 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Massachusetts v. EPA*, 549 U.S. 497 (2007) . . . . . . . . . . . . . . . . . . . . . 7, 17, 19, 20, 21, 22

*Matter of Steuart Transp. Co.*, 495 F. Supp. 38 (E.D. Va. 1980) . . . . . . . . . . . . . . . . . . . . . . 22

*Milwaukee v. Illinois*, 451 U.S. 304 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 25

1 | *New York v. DeLyser*, 759 F. Supp. 982 (W.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 22

2 | *New Jersey v. New York*, 283 U.S. 336 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

3 | *Nixon v. United States*, 506 U.S. 224 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

4 | *North Carolina, ex rel. Cooper v. TVA*, 615 F.3d 291 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . 20

5 | *O'Shea v. Littleton*, 414 U.S. 488 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

6 | *Papasan v. Allain*, 478 U.S. 265 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7 | *Pit River Home & Agric. Co-op. Ass'n v. United States*, 30 F.3d 1088 (9th Cir. 1994) . . . . . . . 11

8 | *Shwarz v. United States*, 234 F.3d 428 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

9 | *Sierra Club v. Andrus*, 487 F. Supp. 443, 445 (D.D.C. 1980) . . . . . . . . . . . . . . . . . . . . . . . . 24

10 | *Sierra Club v. Block*, 622 F. Supp. 842, 866 (D. Colo. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 23

11 | *Sierra Club v. U.S. Def. Energy Support Ctr.*,

12 |     No. 01-11-cv-41, 2011 WL 3321296 (E.D. Va. July 29, 2011) . . . . . . . . . . . . . . . . . . . . . 17

13 | *St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 3

14 | *Summers v. Earth Island Instit.*, 555 U.S. 488 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

15 | *Tenet v. Doe*, 544 U.S. 1 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

16 | *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641 (9th Cir. 1998) . . . . . . . . . . . . . 11

17 | *TVA v. Hill*, 437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

18 | *United States v. Nordic Village, Inc.*, 503 U.S. 30 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

19 | *United States v. 1.58 Acres of Land*, 523 F. Supp. 120 (D. Mass. 1981) . . . . . . . . . . . . . . . . . 23

20 | *United States v. Munoz-Flores*, 495 U.S. 385 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

21 | *Valley Forge Christian College v. Americans United*, 454 U.S. 464 (1982) . . . . . . . . . . . . . . 16

22 | *W. Indian Co., Ltd. v. Gov't of Virgin Islands*, 844 F.2d 1007 (3d Cir. 1988) . . . . . . . . . . . . . 3

23 | *Warth v. Seldin*, 422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

24 | *Winter v. NRDC*, 555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

25

26 | **CONSTITUTION**

27 | U.S. Const. art. III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

28

## RULES

Federal Rule of Civil Procedure 12(b)(1) ........................................... 10

## STATUTES

16 U.S.C. § 1 ..................................................................... 24

28 U.S.C. § 1331 ................................................................... 5

42 U.S.C. §§ 7401-7671q ............................................................ 7

42 U.S.C. § 7411 ................................................................... 8

42 U.S.C. § 7475(a)(4) ............................................................. 8

42 U.S.C. § 7521(a)(1) ............................................................. 7

42 U.S.C. § 7602(g) ................................................................ 7

42 U.S.C. § 7604 .................................................................. 17

42 U.S.C. § 7607(b)(1) ............................................................ 17

42 U.S.C. § 7607(d)(9)(A) .......................................................... 7

43 U.S.C. §§ 1701, 1782(c) ........................................................ 24

## FEDERAL REGULATIONS

74 Fed. Reg. 66,496 (Dec. 15, 2009) ................................................ 7

75 Fed. Reg. 25,324 (May 7, 2010) .................................................. 7

75 Fed. Reg. 31,514 (June 3, 2010) ................................................. 8

76 Fed. Reg. 57,106 (Sept. 15, 2011) ............................................... 8

## MISCELLANEOUS

Huffman, *Speaking of Inconvenient Truths – A History of the Public Trust Doctrine*, 18 Duke Envtl. L. & P. F. (Fall 2007) ........................................................ 3

Pearson, *The Public Trust Doctrine in Federal Law*, 24 J. Land Resources & Envtl L. 173 (2004) ............................................................................. 25

5B Wright, *Federal Practice and Procedure* (3d. ed. 2004) § 1350 ................... 10

13C Wright, *Federal Practice & Procedure* § 3534 (3d ed. 2011) .................... 16

# INTRODUCTION

The Complaint – which seeks a host of judicial declarations as well as judicial imposition of carbon dioxide ($CO_2$) emissions reductions and other far-reaching injunctive obligations on six federal agencies – is brought not under any statute or regulation but under a novel interpretation and radical extension of the "public trust doctrine," a "common law concept." *Sierra Club v. Block*, 622 F. Supp. 842, 866 (D.Colo. 1985). The essence of Plaintiffs' unprecedented claim is that the federal government is a "trustee of the atmosphere" with a fiduciary duty to Plaintiffs not to "manage the trust resource in a way that substantially impairs the public interest in a healthy atmosphere." (Cmplt. ¶¶5-6). Plaintiffs claim they are entitled to enforce such alleged duty here, and ask the Court to order the federal government to take "immediate," "extraordinary" action to "protect, preserve, and restore the atmosphere back into balance." (*Id.* ¶6).

Plaintiffs' claim suffers from a variety of fatal defects. Their claim is barred both by the absence of any waiver of sovereign immunity and the political question doctrine. Plaintiffs lack prudential standing because their suit is comprised of generalized grievances more appropriately addressed by the Legislative and Executive Branches, and they lack Article III standing because they cannot demonstrate that their alleged injury is redressable by the Court. Further, it is not possible to state a federal cause of action such as Plaintiffs' against the United States based on the public trust doctrine, but in any event the claim articulated in Plaintiffs' Complaint falls well outside the bounds of that doctrine as it is properly delimited. Finally, even if Plaintiffs could survive the above threshold deficiencies, this Court need not decide whether Plaintiffs have stated a valid federal common law claim because as the Supreme Court made clear in its recent decision in *Am. Elec. Power Co. Inc. v. Connecticut*, 131 S. Ct. 2527 (2011) ("*AEP*"), the Clean Air Act and other federal statutes displace any such claim.

By seeking dismissal of this case, Defendants do not intend to convey that the United States is not committed to combating climate change. Indeed, the United States has undertaken a wide variety of initiatives to address climate change and "will continue to vigorously develop and build on its domestic and international efforts" in that realm over the coming years. *See* U.S. Department of State's *Fifth Climate Action Report to the UN Framework Convention on Climate Change (2010) ("2010 Climate Action Report")*, Executive Summary at 4 (*see* http://www.state.gov/g/oes/rls/rpts/car5/index.htm. This litigation, however, is assuredly not the proper vehicle to address the monumental challenges that climate change

1  poses not just for the United States but for the world.

2  **BACKGROUND**

3  **A.    Public Trust Doctrine**

4  Plaintiffs' Complaint misconstrues the public trust doctrine's foundations, uses, and limits.  The

5  classic statement of the doctrine was articulated in *Ill. Cent. R.R. Co. v. Illinois*, 146 U.S. 387 (1892), where

6  the Supreme Court invalidated the transfer of 1000 acres of submerged lands in Lake Michigan to the

7  Illinois Central Railroad, explaining that dominion and sovereignty over submerged lands belong to the

8  state in which the land is found.  *Id.* at 435.  The Court noted that title to such submerged lands is "different

9  in character from that which the State holds in lands intended for sale" because it is "held in trust for the

10  people of the State, that they may enjoy the navigation of the waters, carry on commerce over them, and

11  have liberty of fishing therein, freed from the obstruction or interference of private parties." *Id.* at 452.

12  Illinois, the Court held, "can no more abdicate its trust over property in which the whole people are

13  interested, like navigable waters and the soils under them, so as to leave them entirely under the use and

14  control of private parties . . . than it can abdicate its police powers in the administration of government and

15  the preservation of peace." *Id.* at 453.  Several decades after *Ill. Cent. R.R.* was decided, the Supreme

16  Court made clear in *Light v. United States*, 220 U.S. 523, 537 (1911), that while "the public lands of the

17  nation are held in trust for the people of the whole country," (citation and internal quotation omitted) "it is

18  not for the courts to say how that trust shall be administered. That is for Congress to determine."  As

19  explained in *Light*, *id* at 537:

20  The courts cannot compel [the United States government] to set aside the lands for settlement, or to
   suffer them to be used for agricultural or grazing purposes, nor interfere when, in the exercise of its
21  discretion, Congress establishes a forest reserve for what it decides to be national and public
   purposes.  In the same way and in the exercise of the same trust it may disestablish a reserve, and
22  devote the property to some other national and public purpose.  These are rights incident to
   proprietorship, to say nothing of the power of the United States as a sovereign over the property
23  belonging to it.

24  Almost a century later, the D.C. Circuit in *Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1082

25  (D.C. Cir. 1984), stated:  "At the core of the public trust doctrine is the principle that navigable waters are

26  held by the sovereign in trust for certain public uses."

27  Judicial exegesis on the doctrine teaches that while the English sovereign held title to and had
   dominion over tidewaters and the soil under them, his use of these waters and lands was
28  circumscribed by the public's paramount interests in navigation, commerce and fishing.

1  *Id.*[1] The court explained that in the United States "the public trust doctrine has developed almost

2  exclusively as a matter of state law" and functions as a "constraint on *states'* ability to alienate public trust

3  lands and as a limitation on uses that interfere with trust purposes." *Id.* at 1082-83 (emphasis added). *See*

4  *also St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515, 521 (8th Cir. 1999) ("public trust doctrine supports

5  the states' authority to regulate navigation and to protect and preserve the public waters."); *Lake Mich.*

6  *Fed'n v. U.S. Army Corps of Eng'rs*, 742 F. Supp. 441, 446 (N.D. Ill. 1990) (doctrine polices state

7  legislature's disposition of public lands).

8       The  public trust doctrine "varies from state to state and has been altered by statute and in a number

9  of state constitutions." *W. Indian Co., Ltd. v. Gov't of V.I.*, 844 F.2d 1007, 1019 (3d Cir. 1988).  However,

10  even where the doctrine applies, if a challenged conveyance represents a "deliberate and reasonable

11  decision of the sovereign that the transaction of which the conveyance is a part affirmatively promotes the

12  public interest in the submerged lands, the courts have deferred to the sovereign's decision." *Id.*  While the

13  public trust doctrine functions in some states as a constraint on a *state's* ability to alienate public trust lands

14  and as a potential limitation on uses that interfere with trust purposes, the doctrine has been held not to

15  support a valid claim under *federal* common law. *See, e.g., New York v. DeLyser*, 759 F. Supp. 982, 990

16  (W.D.N.Y. 1991)("claims relating to the public trust doctrine do not 'arise under' federal law.").

17      **B.**    **The Complaint**

18      **1.**    **General Allegations.**  Plaintiffs, five minors and two environmental advocacy

19  organizations, filed their initial complaint in May 2011.  Their First Amended Complaint, filed July 27,

20  2011 but not served until October 11, 2011, is not significantly different from the initial one.  It alleges (¶2)

21  that under "basic trust principles" the "United States government" has an "affirmative fiduciary obligation

22  to control atmospheric contamination that has caused catastrophic and irreparable damage to our lands,

---

[1] Some commentators who have explored the historical roots of the public trust doctrine dispute the notion that the public "has deeply rooted rights in access to and use of resources important to the public welfare." *See, e.g.,* Huffman, *Speaking of Inconvenient Truths – A History of the Public Trust Doctrine*, 18 Duke Envtl. L. & P. F. (Fall 2007), at 1.  Professor Huffman concludes that there was "nothing resembling the modern idea of public trust in Roman law and the claimed restraint on alienation of state owned waters and lands is belied by a history of pervasive ownership in both Rome and England." *Id.* at 1-2.  He decries any reliance on the doctrine to endow courts with "expansive powers to invalidate the democratic choices of the elected representatives of the people." *Id.* at 3.

1  businesses, national security, and health." (*Id.*).[2]/ Plaintiffs ask the Court to "immediately" order "the

2  federal government" to "accept its fiduciary responsibility mandated by the Public Trust Doctrine." (*Id.*

3  ¶9). They ask the Court to find that the Defendant agency heads "by their actions of causing, approving and

4  allowing too many carbon emissions into Earth's atmosphere, cumulatively resulting in global heating,

5  ocean acidification, melting icecaps and ice sheets, biodiversity loss, and extreme weather events have

6  breached and are continuing to breach their duty as trustees." (*Id.* ¶10).

7    **2.    Allegations Directed Against The Agency Defendants.**  The allegations fall into two

8  general categories: (1) broadly alleged agency failures to properly regulate or to take actions that Plaintiffs

9  assert would reduce or ameliorate greenhouse gas emissions by others ("passive" contributions, Cmplt.

10  ¶65); and (2) alleged direct agency contributions (through energy consumption and other agency activities)

11  to such greenhouse gas emissions ("active" contributions, *id.*).  Not all of the allegations fall neatly into

12  these categories, however – DOI is cited for violating its duty to "provide climate-safe energy." (*Id.* ¶55.)

13    Under the first category, Plaintiffs allege violations of trust obligations by:

14  •    EPA, because it has "failed to effectively implement and enforce the laws under its jurisdiction" and
15  thus failed to protect the atmosphere. (*Id.* ¶53);

16  •    DOI, for permitting "logging, livestock grazing, off-road vehicle use, the extraction of coal, coal bed
   methane, oil, oil shale and natural gas, and oil, coal and electric infrastructure and transmission facilities on
17  public land." (*Id.* ¶55);

18  •    USDA, for permitting "large-scale logging in national forests," and for failing to protect "the
   atmospheric trust from greenhouse gases from farming, agricultural practices, and fossil fuel extraction and
19  use under its jurisdiction." (*Id.* ¶57);

20  •    Commerce, for failing to protect the atmosphere and "other natural resources under its jurisdiction"
   "in its efforts to make American industry competitive." (*Id.* ¶59); and

21  •    DOE, for failing to "advanc[e] clean, reliable, and affordable energy to replace fossil fuel sources of
22  energy, which are wasting the trust asset." (*Id.* ¶61).

23    In the second category, the Complaint focuses on DOD, which Plaintiffs allege is responsible for

24  "enormous" greenhouse gas emissions from its "vehicle fleet, electricity for buildings, and its weapons

25  infrastructure," and which thus allegedly contributes to the "climate warming situation" and "waste of the

---

27  [2] Although the Complaint sometimes refers to alleged fiduciary and trust obligations of the "federal" (*e.g.*,
   Cmplt. ¶ 9) and "United States" (*id.* pp. 38-39) governments, the Complaint is brought not against the
28  United States but the heads of six specific federal agencies.

1  Public Trust in the atmosphere." (*Id.* ¶63).

2  **3.   Claim for Relief.**

3  Although Part VI is titled "CLAIMS FOR RELIEF," the Complaint asserts just one: "Claim I:

4  Violations of the Public Trust Doctrine." (Cmplt. p. 36).  Plaintiffs contend in that claim that under the

5  public trust doctrine, Defendants – as federal agencies and officers – are trustees of "Public Trust

6  resources," including "our atmosphere in its ambient or interstate aspects." (*Id.* ¶¶138-39).  They allege

7  that the United States, "as a sovereign nation," has a duty to protect natural resources that cannot be

8  "abrogated" and exists "[a]s long as the sovereign exists." (*Id.* ¶137).  They allege (*id.* ¶¶139-142) that

9  Defendants "and each of them" (but in these paragraphs, not the United States government as a whole) are

10  trustees of public trust resources pursuant to "the Due Process Clauses of the 5th and 14th Amendments,"

11  "Equal Protection principles of the 14th Amendment," the "Commerce Clause" and unspecified "statutory

12  provisions committing to the people of the United States that the United States government will hold

13  natural resources in trust for the benefit of the people."

14  Claim I further alleges that the federal government is a "co-tenant sovereign trustee" of the

15  atmosphere and "shares a duty with other co-tenant sovereigns" – none of whom is named as a co-

16  defendant here or (other than "Tribal Nations") even identified – to protect the atmosphere as "the trust

17  asset and prevent its waste or harm for the benefit of the people, including Plaintiffs and future generations

18  of citizens." (*Id.* ¶143).  Plaintiffs allege (*id.* ¶¶148, 151) that Defendants have "caused injuries that are

19  irreparable and monetary damages alone are inadequate to remedy these injuries," and that the public trust

20  doctrine obligates Defendants to "take all actions necessary to reduce the United States government's fair

21  and equitable share of carbon emissions."[3]/ Plaintiffs assert that the "check and balance of judicial review"

22  provides a "level of protection against improvident disposition or waste of an irreplaceable trust asset" (*id.*

23  ¶153), and that this Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) (Cmplt. ¶21).

24  **4.   Prayer for Relief.**

25  **a.   Declaratory Relief:**  Plaintiffs' Prayer (Cmplt. pp. 38-39) requests a

26  multitude of far-reaching judicial declarations, many of which are purely advisory in nature:

27  

28  [3] Notwithstanding this reference to monetary damages, Plaintiffs do not seek such an award here.

*Mem. in Support of Def. Motion to Dismiss: Case No. C11-2203 EMC*                    -5-

•     The atmosphere is a "Public Trust resource" (or a "commonly shared Public Trust asset") that the United States government has a fiduciary duty as trustee to preserve and protect.

•     Such duty, which includes not "taking actions that waste or damage this asset," is enforceable by Plaintiffs "as citizen beneficiaries of the Public Trust" who "represent present and future generations."

•     The federal government's obligations must be "dictated by the best available science on protecting a sustainable atmosphere and climate for present and future generations."

•     Defendants are violating their duty as trustees of the atmosphere by "contributing to and allowing unsafe amounts" of greenhouse gases, leading to "human made global warming, ocean acidification, and all of the ramifications associated with the alteration of the atmosphere and Earth's natural systems."

•     Defendants "bear liability" for "reducing greenhouse gas pollution into the atmosphere and altering the atmosphere and Earth's natural systems."

•     "Rapid reduction" of greenhouse gas emissions is needed to preserve "Earth's atmosphere and natural systems," because atmospheric concentrations of $CO_2$ above 350 parts per million, "if sustained beyond this century," are "likely" to cause global warming substantially greater than 1°C above "preindustrial temperatures," and "ocean acidification, massive deglaciation, and disintegration of ice sheets, in addition to widespread harm to Earth's natural systems."

•     The federal government has a duty to take "immediate measures consistent with the goal of restoring" global atmospheric $CO_2$ levels to below 350 parts per million (ppm) "this century."

•     To "draw down" $CO_2$ levels to achieve the "scientific prescription" for meeting their duty to protect the atmosphere, Defendants must act "collaboratively" to: "enable" global fossil fuel $CO_2$ emissions to "peak" by 2012; reduce such emissions by at least 6% per year through at least 2050; and cease "deforestation and reforest degraded forest lands and improve soil conditions on agricultural lands that will sequester an additional 100 gigatons of carbon this century."

•     To "support effective global collaboration" to protect the atmosphere and "Earth's natural systems," the federal government is obligated – as allegedly "agreed" to under the U.N. Framework Convention on Climate Change – to act pursuant to its "common but differentiated responsibility and respective capabilities" to "reduce its own emissions" and "provide financial and technological assistance to developing countries to support them in reducing their own emissions, at an aggregate rate consistent with a rate of global emissions decline of 6% per year."

    **b.**    **Injunctive Relief:** Plaintiffs' Prayer (Cmplt. pp. 39-40) requests a mandatory injunction that would order Defendants to:

    (1) Take action "consistent with" the federal government's "equitable share of the global effort, corresponding to its share of the responsibility for causing an increase in greenhouse gas concentrations and its financial and technological capability to reduce global emissions, and thereby enable *global* $CO_2$ emissions to peak by December 2012" and "decline" by at least 6% per year thereafter (emphasis added);

    (2) Take "all necessary actions" to reduce $CO_2$ emissions "*in the United States*" by "at least" 6% per year beginning in 2013 (emphasis added); and

    (3) Prepare by December 31, 2011 and submit for Court approval: (a) an annual "accounting or

inventory" of all greenhouse gas emissions "originated by the United States and its citizens and corporations," (b) an annual "carbon budget" consistent with the reductions sought in injunction request nos. (1) and (2), above, and (c) a "climate recovery plan, consistent with the best available science," "calibrated" to achieve the reductions sought in injunction request nos. (1) and (2), above.

Plaintiffs ask (Cmplt. ¶22) the Court to retain jurisdiction "until such time as the Court is satisfied that all public trust violations have been fully and effectively remediated," presumably through the end of this century given that in their Memorandum in support of their Motion for Preliminary Injunction ("P/I Mem.": Doc. 24) (at 1), they ask the Court to order Defendants to prepare a "climate recovery plan" setting forth "the means" to return atmospheric $CO_2$ levels to 350 ppm by December 31, 2099.

### C. SUPREME COURT DECISIONS: *MASSACHUSETTS v. EPA*; *AMERICAN ELECTRIC POWER CO. v. CONNECTICUT*

The Supreme Court has recently issued two decisions addressing climate change. In the first, *Massachusetts v. EPA*, 549 U.S. 497 (2007), several states and environmental groups challenged EPA's denial of a rulemaking petition. The Court held that the Clean Air Act, 42 U.S.C. §§ 7401-7671q ("CAA"), authorizes federal regulation of emissions of carbon dioxide and other greenhouse gases, and that EPA misread that statute when in 2003 it denied a rulemaking petition seeking controls on greenhouse gas emissions from new motor vehicles. The Court determined (549 U.S. at 528-29) that greenhouse gases qualify as "air pollutant[s]" within the meaning of the governing statutory provision (quoting CAA § 7602(g)), and therefore are within EPA's "regulatory ken." The Court ruled that because EPA had authority to set greenhouse gas emission standards but had not offered a "reasoned explanation" for failing to do so, EPA had not acted "in accordance with law" when it denied the requested rulemaking. 549 U.S. at 534-35 (quoting CAA § 7607(d)(9)(A)).

After *Massachusetts*, EPA undertook greenhouse gas regulation on multiple fronts. In 2009, EPA concluded that greenhouse gas emissions from motor vehicles "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare," title II of the CAA's regulatory trigger. CAA § 7521(a)(1); 74 Fed. Reg. 66,496 (Dec. 15, 2009). Subsequently, EPA and the U.S. Department of Transportation issued a joint final rule regulating light-duty vehicle emissions, *see* 75 Fed. Reg. 25,324 (May 7, 2010), and finalized a joint rulemaking covering medium- and heavy-duty vehicles. 76 Fed. Reg.

57,106 (Sept. 15, 2011).  EPA also began phasing in requirements that new or modified "[m]ajor

[greenhouse gas] emitting facilities" use the "best available control technology." CAA § 7475(a)(4); 75

Fed. Reg. 31,514, 31,520-21 (June 3, 2010).  EPA has also stated its intention to commence a rulemaking

(under CAA § 7411) to set limits on greenhouse gas emissions from new, modified, and existing fossil-fuel

fired power plants and petroleum refineries.

Prior to EPA taking the above regulatory initiatives, two groups of plaintiffs filed separate common

law complaints in the Southern District of New York against a select group of major electric power

concerns – four private companies and the Tennessee Valley Authority, a federally-owned corporation that

operates fossil-fuel fired power plants in several states.  One plaintiff group included eight States and New

York City; the second included three nonprofit land trusts.  Both groups alleged that the defendants were

the largest $CO_2$ emitters in the United States whose emissions, by contributing to global warming,

substantially and unreasonably interfered with "public rights," in violation of the federal common law of

interstate nuisance.  The governmental plaintiffs alleged that public lands, infrastructure, and health were at

risk from climate change; the trusts asserted that climate change would destroy animal habitats and rare tree

and plant species on land the trusts owned and conserved.  Plaintiffs in both suits sought an injunction

requiring each defendant to cap its $CO_2$ emissions and reduce them by a specified percentage each year for

at least a decade.

The district court dismissed the suits as presenting non-justiciable political questions; the Second

Circuit reversed.  *Conn. v. Am. Elec. Power Co. Inc.*, 582 F.3d 309 (2d Cir. 2009).  On the threshold

questions, the court held that the suits were not barred by the political question doctrine, *id.*, at 332, and that

plaintiffs had adequately alleged Article III standing, *id.* at 349.  On the merits, it held that plaintiffs had

stated a claim under the federal common law of nuisance, *id.* at 358, 371, and that the CAA did not

"displace" federal common law.  *Id.* at 381.  It expressed "no opinion at this time as to whether the actual

regulation of greenhouse gas emissions under the CAA by EPA, if and when such regulation should come

to pass, would displace Plaintiffs' cause of action under the federal common law." *Id.*

In a unanimous decision, the Supreme Court reversed.  *Am. Elec. Power Co. Inc. v. Connecticut,*

131 S. Ct. 2527 (2011) ("*AEP*").  On standing, the Court stated that four Justices would hold that "at least

some plaintiffs have Article III standing under *Massachusetts,* which permitted a State to challenge EPA's

refusal to regulate greenhouse gas emissions," and that no other "threshold obstacle bars review," while four Justices "would hold that none of the plaintiffs have standing." *Id.* at 2535. Because it was equally divided on the issue, it affirmed the Second Circuit's exercise of jurisdiction and proceeded to the merits. (Justice Sotomayor was recused.)[4]/

After stating that the appropriate test for whether congressional legislation "excludes the declaration of federal common law" is "simply whether the statute 'speak[s] directly to [the] question' at issue," *id.* at 2537 (citation omitted), the Court found that the CAA, as "federal legislation authorizing EPA to regulate carbon-dioxide emissions," displaced any "federal common- law claim for curtailment of greenhouse gas emissions because of their contribution to global warming." *Id.* at 2530. The Court stated that the CAA "is no less an exercise of the legislature's 'considered judgment' concerning the regulation of air pollution because it permits emissions *until* EPA acts." *Id.* at 2538 (emphasis in original, citation omitted). "Indeed, were EPA to decline to regulate carbon-dioxide emissions altogether at the conclusion of its ongoing § 7411 rulemaking, the federal courts would have no warrant to employ the federal common law of nuisance to upset the agency's expert determination." *Id.* at 2538-39. Noting that EPA may not decline to regulate carbon-dioxide emissions from power plants if such a refusal to act would be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," (citing CAA § 7607(d)(9)(A)), the Court explained that federal law provides them with a remedy: if plaintiffs are "dissatisfied with the outcome of EPA's forthcoming rulemaking, their recourse under federal law is to seek Court of Appeals review, and, ultimately, to petition for certiorari in this Court." *Id.* at 2539.

Describing EPA as the expert agency that Congress designated to serve as the "primary regulator" of greenhouse gas emissions, the Court explained that EPA is "surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions."

> Federal judges lack the scientific, economic, and technological resources an agency can utilize in coping with issues of this order. Judges may not commission scientific studies or convene groups of experts for advice, or issue rules under notice-and- comment procedures inviting input by any interested person, or seek the counsel of regulators in the States where the defendants are located.

*Id.* at 2539-40. Unlike federal agencies, "judges are confined by a record comprising the evidence the

---

[4] The Court noted but did not reach TVA's prudential standing argument.   131 S. Ct. at 2535 n.6.

1  parties present." *Id.* Further, "federal district judges, sitting as sole adjudicators, lack authority to render

2  precedential decisions binding other judges, even members of the same court." *Id.* at 2540.  This

3  "prescribed order of decisionmaking" – with the first "decider" being the expert administrative agency, and

4  the second, federal judges – is "yet another reason to resist setting emissions standards by judicial decree"

5  under federal common law.  Climate change issues are infused with complex policy concerns:

> The appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be
> prescribed in a vacuum: as with other questions of national or international policy, informed assess-
> ment of competing interests is required. Along with the environmental benefit potentially
> achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the
> balance.

9  *Id.* at 2539.  The Court flatly rejected the plaintiffs' proposal that individual federal judges determine "in

10  the first instance" – in suits that could be brought in any federal district court against potentially thousands

11  of defendant $CO_2$ emissions contributors – what emissions are "unreasonable" and what reductions are

12  "practical, feasible and economically viable."  Such a process "cannot be reconciled with the

13  decisionmaking scheme Congress enacted." *Id.* at 2540.

### D.    LEGAL STANDARDS FOR A MOTION TO DISMISS

15        Federal Rule of Civil Procedure 12(b)(1) allows litigants to seek the dismissal of an action from

16  federal court for lack of subject matter jurisdiction.  On a motion to dismiss for lack of subject matter

17  jurisdiction, the plaintiff must demonstrate that subject matter jurisdiction exists to defeat dismissal.  *See*

18  *A-Z Int'l v. Phillips*, 323 F.3d 1141, 1145 (9th Cir. 2003).  In deciding a motion to dismiss under Rule

19  12(b)(6), the Court must construe the facts alleged in the complaint in the light most favorable to the drafter

20  of the complaint, and the Court must accept all well-pleaded factual allegations as true. *See Shwarz v.*

21  *United States*, 234 F.3d 428, 435 (9th Cir. 2000).  However, the Court need not accept as true a legal

22  conclusion couched as a factual allegation, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or an allegation

23  that contradicts facts that may be judicially noticed by the Court, *Shwarz*, 234 F.3d at 435.  Generally,

24  dismissal of claims under Rule 12(b)(1) should be addressed before reasons for dismissal under Rule

25  12(b)(6).  *See* 5B Wright, *Federal Practice and Procedure* (3d. ed. 2004) § 1350, at 138-39.

### ARGUMENT

### I.    THE UNITED STATES HAS NOT WAIVED SOVEREIGN IMMUNITY HERE

28        It is fundamental under the doctrine of sovereign immunity that the United States is immune from

1   suit except when Congress has waived the Government's immunity. *See Tucson Airport Auth. v. Gen.*

2   *Dynamics Corp.*, 136 F.3d 641, 644 (9th Cir. 1998). The doctrine applies to federal agencies and to federal

3   employees acting within their official capacities. *Hodge v. Dalton*, 107 F.3d 705, 707 (9th Cir. 1997).

4   Waivers of sovereign immunity, to be effective, "must be unequivocally expressed." *United States v.*

5   *Nordic Village, Inc.*, 503 U.S. 30, 33-34 (1992) (internal citations and quotations omitted). Unless the

6   United States consents to be sued, the Court lacks subject matter jurisdiction over claims against the federal

7   government. *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173

8   (9th Cir. 2007).

9      Plaintiffs cite no waiver of sovereign immunity for their claim. They simply cite 28 U.S.C. § 1331

10   (Cmplt. ¶ 21), which does not waive sovereign immunity. *See Pit River Home & Agric. Co-op. Ass'n v.*

11   *United States*, 30 F.3d 1088, 1098 n.5 (9th Cir.1994). The Complaint should be dismissed on this basis,

12   alone.

13   **II.    THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFFS' CLAIM**

14      Plaintiffs' claim is unfit for judicial resolution under the political question doctrine, which is

15   animated by separation-of-powers principles. *Baker v. Carr*, 369 U.S. 186, 210 (1962) ("The

16   nonjusticiability of a political question is primarily a function of the separation of powers."). The same

17   fundamental concern undergirds other doctrines, including standing and displacement, which as discussed

18   *infra*, also bar Plaintiffs' claim.

19      All of the doctrines that cluster about Article III – not only standing but mootness, ripeness, political

20   question, and the like – relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and

21   prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.

22   *Allen v. Wright*, 468 U.S. 737, 750 (1984) (citation omitted).

23      The political question doctrine derives "in large part from prudential concerns about the respect

24   [courts] owe the political departments." *Nixon v. United States*, 506 U.S. 224, 252-253 (1993) (citation

25   omitted). In applying the doctrine, there is no simple test for identifying which questions courts should

26   refrain from addressing lest they "inappropriate[ly] interfere[] in the business of the other branches of

27   Government." *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990). But in *Baker*, 369 U.S. at 217,

28   the Supreme Court identified six guiding factors:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Although many of those *Baker* factors exist here, this case raises the highest concerns with respect to the "lack of judicially discoverable and manageable standards" and the "impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." 369 U.S. at 217.  Plaintiffs' far-flung theory of liability could provide virtually every person, organization, and company – public or private – with a claim against the United States and every federal agency.  Resolving such claims would require the federal courts to consider and opine on numerous, complex, and far-reaching technological, economic, scientific, and policy issues.  It would also require each court in which a complaint is filed to make difficult predictive judgments in determining whether and to what extent the United States in general or each agency individually should be held liable (not under a statute but under vague notions of what constitutes a breach of trust duties) for some share of the injuries associated with global climate change.  The present Complaint would require this Court to determine how each agency must not only  limit its own emissions to some judicially-mandated extent but also reorder its priorities and rewrite its regulations in order to, among other things, "enable" "*global*" $CO_2$ emissions to "peak" in 2012 and decline at least 6% a year "thereafter." (Cmplt. p. 39) (emphasis added).[5]/

These potential difficulties are compounded by the prospect that different district courts entertaining such suits could reach widely divergent results, based, *inter alia*, on different findings of fact, or on different assessments of what is reasonable or even possible, or on different exercises of equitable discretion in fashioning relief.  Such suits would lack the benefits of centralized decisionmaking that characterize Executive agency action.  Moreover, a ruling in one case brought by particular plaintiffs would not assure a final resolution for the defendants involved because other potential plaintiffs would not be

---

[5] Plaintiffs state (P/I Mem. at 2) that nations other than the United States account for 72 percent of "the world's $CO_2$ emissions."  This raises the obvious question how the Court could enjoin these six Defendants to take actions that "enable" global $CO_2$ emissions to "peak" by the end of 2012.

1    bound by the judgment and could bring their own suits in different courts, which could – and, almost

2    certainly, would – reach conflicting decisions.  Such suits would lack the certainty and repose that the

3    political Branches can afford through legislative and regulatory action.

4         The separation-of-powers concerns in this case arise from a confluence of factors, including (but in

5    no way limited to) the extraordinary breadth of Plaintiffs' claim and requested declaratory and injunctive

6    relief; the complex and multifarious policy judgments implicated by the claim that rulemakings and other

7    regulatory actions taken (or not taken) by the agencies selected by Plaintiffs constitute breaches of fiduciary

8    duties; the unprecedented nature of the relief sought, including requests that this Court order the agencies to

9    prepare and submit, starting in a few months (December 31, 2011), an annual "accounting or inventory" of

10   "all" greenhouse gas emissions "originated by the United States and its citizens and corporations," an

11   annual "carbon budget," and a "climate recovery plan"; the national security ramifications implicated in

12   Plaintiffs' request that this Court enjoin the Defense Department to significantly reduce its greenhouse gas

13   emissions by 2013 and each year thereafter for decades; the fiscal and diplomatic ramifications were this

14   Court to declare that the United States "must" provide "financial and technological support to developing

15   countries to support them in reducing their own emissions"; and Congress's enactment, pursuant to its

16   enumerated powers under Article I, Section 8 of the Constitution, of the CAA provisions that authorize

17   EPA to regulate air-pollutant emissions, coupled with EPA's decisions regulating greenhouse gas emissions

18   under the CAA.  Determining appropriate restrictions on greenhouse gas emissions is a task suited for

19   resolution by the other Branches, which possess the requisite scientific and technical expertise and

20   centralized decisionmaking authority and are politically accountable.  Development by the Judiciary of a

21   parallel system of common-law regulation of greenhouse gas emissions would, at the least, frustrate and

22   complicate ongoing and future legislative and regulatory undertakings.

23        The claims (and defenses) in this case would thus present unique problems for the Judiciary.  The

24   difficulty of those claims for judicial resolution – particularly in the absence of a statute assigning the

25   Judiciary such a role – is more marked in light of the steps that have been taken by the political Branches to

26   regulate in this area.  The consequence of those steps is that any judicial remedy that might otherwise have

27   existed for a federal common law public trust doctrine claim (assuming *arguendo* that such a claim can be

28   validly stated) has been displaced by the actions of Congress and EPA.  *See* Argument V, *infra*.  Such

1  displacement of federal common law through the actions of the political Branches is itself a manifestation

2  of the separation of powers. *See Milwaukee v. Illinois*, 451 U.S. 304, 315 (1981) ("*Milwaukee II*") ("Our

3  'commitment to the separation of powers is too fundamental' to continue to rely on federal common law

4  'by judicially decreeing what accords with common sense and the public weal'" when Congress has

5  addressed the problem.") (quoting *TVA v. Hill*, 437 U.S. 153, 195 (1978)).[6]/

6      The predicate for Plaintiffs' Complaint is that the United States has defaulted on its alleged duty to

7  take steps to protect and preserve the global atmosphere, and that the Court must therefore intervene and

8  oversee "the effectiveness of federal authorities in planning and managing our nation's response to human-

9  induced global energy imbalance." (Cmplt. ¶ 16). While it is not the Court's proper role here to assess the

10 effectiveness of the federal government's actions to address climate change, it bears mention that Plaintiffs

11 ignore that the United States government (not just EPA) has taken a number of initiatives to address climate

12 change. As discussed in the State Department's *2010 Climate Action Report*, "since assuming office in

13 January 2009, President Obama has renewed the U.S. commitment to lead in combating climate change."

14 *Executive Summary* at 2. The Report explains that "the Obama administration, together with the U.S.

15 Congress, has taken major steps to enhance the domestic effort to promote clean energy solutions and tackle

16 climate change." *Id.* In addition to EPA's regulatory initiatives (described in Background Section C.,

17 *infra*), such steps include (among others):

18 •   Through the American Recovery and Reinvestment Act, signed into law in February 2009, the
19     United States "allocated over $90 billion for investments in clean energy technologies to create
       green jobs, speed the transformation to a clean, diverse, and energy-independent economy, and help
20     combat climate change." *Exec. Summary* at 2-3.

21 •   In September 2009, EPA announced its plan to collect greenhouse gas emission estimates from
       facilities responsible for 82.5 percent of such emissions across diverse sectors of the economy,

22

23 ―――――――――――――――

24 [6] There is yet another aspect of this case that supports dismissal. Plaintiffs seek only injunctive relief,
   which "is a matter of equitable discretion" that "does not follow from success on the merits as a matter of
25 course." *Winter v. NRDC*, 555 U.S. 7, 32 (2008). This Court could determine that the Complaint, because
   it is not based on any statutory cause of action, should be dismissed at the outset on equitable grounds. *Cf.*
26 *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974) ("[Article III standing] considerations obviously shade into
   those determining whether the complaint states a sound basis for equitable relief; and even if we were
27 inclined to consider the complaint as presenting an existing case or controversy, we would firmly disagree
   with the Court of Appeals that an adequate basis for equitable relief against petitioners had been stated.").
28 Such a disposition, in the unique circumstances of a federal common law claim, would rest on the serious
   separation-of-powers concerns this case presents.

1   including power generation and manufacturing. *Id.* at 3.

2   •   In October 2009, the President issued "an Executive Order requiring federal agencies to set and meet strict green house gas reduction targets by 2020." The President also called for "more
3   aggressive efficiency standards for common household appliances and put in motion a program to open the outer continental shelf to renewable energy production." *Id.*
4
5   •   Since entering office, the Obama administration has "ramped up" U.S. engagement with other countries through the United Nations Framework Convention on Climate Change and "through
6   complementary efforts in support of a successful global climate agreement." For example, in 2009, President Obama launched the Major Economies Forum on Energy and Climate, "establishing an
7   enhanced dialogue among 17 developed and developing economies representing 80 percent of global emissions to help support the multilateral negotiating process and devise new ways to
8   advance the development and deployment of clean energy technologies." *Id.* at 3.

9   These measures are illustrative of the Executive Branch's commitment to address climate change.

10   More importantly for present purposes, however, they demonstrate how climate change issues are

11   thoroughly infused with domestic and foreign policy considerations that are manifestly inappropriate for

12   judicial resolution. Plaintiffs' cause of action is precisely the sort of claim that is unfit for judicial

13   resolution under the political question doctrine.[7]/

**III.   PLAINTIFFS LACK STANDING TO ASSERT THEIR FEDERAL COMMON LAW**
14   **PUBLIC TRUST DOCTRINE CLAIM**

15   "The rules of standing, whether as aspects of the Art[icle] III case-or-controversy requirement or as

16   reflections of prudential considerations . . . , are threshold determinants of the propriety of judicial

17   intervention" that must be established by a complainant who seeks "the exercise of the court's remedial

18   powers." *Bender v. Wmsport. Area Sch. Dist.*, 475 U.S. 534, 546 n.8 (1986)(quoting *Warth v. Seldin*, 422

19   U.S. 490, 517-518 (1975)). A claim (including a federal common law claim) must be dismissed for want of

20   jurisdiction when a plaintiff lacks standing. *See, e.g., City of Phila. v. Beretta U.S.A.*, 277 F.3d 415, 420

21   n.3 (3d Cir. 2002) (civic groups lacked standing to bring common law claims against gun makers).

22   Standing doctrine comprises two parts: "Article III standing, which enforces the Constitution's

23   case-or-controversy requirement, and prudential standing, which embodies judicially self-imposed limits on

24   the exercise of federal jurisdiction." *Elk Grove Unif. Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (citation

25   and internal quotation marks omitted). Prudential standing may be resolved at a case's outset, before

26

27

28   [7] If the Court resolves this motion on sovereign immunity or political question grounds, it need not reach the Complaint's remaining defects, addressed below.

*Mem. in Support of Def. Motion to Dismiss: Case No. C11-2203 EMC*                                                -15-

Article III standing. *See Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) (prudential standing "represents the sort of 'threshold question' we have recognized may be resolved before addressing jurisdiction"); *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (assuming Article III standing in order to address prudential standing).

### A. Plaintiffs Lack Prudential Standing Because Their Claim Is Composed Of Generalized Grievances More Appropriately Addressed By The Legislative and Executive Branches

Prudential standing is essentially a matter of "judicial self-governance." *Warth*, 422 U.S. at 500. Without such limitation, "the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Newdow*, 542 U.S. at 11 (quoting *Warth*, 422 U.S. at 500). Judicial self-restraint is particularly appropriate where, as here, a court is asked to entertain a cause of action based on federal common law that is itself fashioned by the Judiciary.

### 1. This Court should refrain from adjudicating generalized grievances like Plaintiffs' common law public trust claim

Prudential standing requires federal courts to refrain from adjudicating "generalized grievances more appropriately addressed in the representative branches." *Newdow*, 542 U.S. at 12 (quoting *Allen*, 468 U.S. at 751). Plaintiffs' sprawling common law claim is precisely that kind of generalized grievance. *Id.*[8]/

Plaintiffs do not invoke a "constitutional or statutory provision" that could "properly . . . be understood as granting persons in the plaintiff[s'] position a right to judicial relief." *Warth*, 422 U.S. at 500. To the contrary, Congress has vested EPA, an expert agency, with the power to regulate $CO_2$ as a pollutant, and has provided for judicial review of EPA's actions in exercising that regulatory power. *See*

---

[8] There is considerable overlap between the prudential standing and political question doctrines. Standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Valley Forge Christian College v. Americans United*, 454 U.S. 464, 484 (1982) (citation omitted). The political question doctrine examines whether "a particular question is beyond judicial competence, no matter who raises it." 13C Wright et al., *Fed. Practice & Procedure* § 3534 (3d ed. 2011). Both the political question doctrine and prudential standing's "generalized grievance" limitation are based, at least in part, on the idea that another branch of government would be more appropriate to hear the grievance. In short, a party lacks prudential standing to bring a "generalized grievance" involving a request for adjudi- cation of abstract questions of wide public significance that are "pervasively shared and most appropriately addressed in the representative branches." *Valley Forge*, 454 U.S. at 475; *Warth*, 422 U.S. at 499.

1    *Massachusetts,* 549 U.S. at 516 (discussing 42 U.S.C. § 7607(b)(1)).  Congress has also provided for citizen

2    suits to enforce any emissions standards that EPA establishes or to challenge EPA's failure to perform a

3    statutory non-discretionary act or duty.  *See id.* § 7604.  But this suit is neither a petition for review of final

4    agency action nor a citizen suit, and those statutory provisions and remedies are not at issue.  Plaintiffs'

5    fundamental grievance is that EPA "has failed to effectively implement and enforce the laws under its

6    jurisdiction." (Cmplt. ¶53).  Similar generalized complaints are alleged against the other agencies without

7    citation to any statutory violations or reference to congressionally recognized statutory remedies.

8         Instead of relying on any statutory cause of action, Plaintiffs have elected to seek relief under the

9    common law by suing a handful of federal agencies from among an almost limitless array of governmental

10   entities – domestic and foreign, national and local – that either emit greenhouse gases or otherwise impact

11   or affect (directly or indirectly) atmospheric $CO_2$ levels.  Further, the alleged improper agency conduct –

12   failing to "effectively implement and enforce" the law (EPA), allowing "oil, coal and electric infrastructure

13   and transmission facilities on public land" (DOI), "permitting large-scale logging in national forests"

14   (USDA) (Cmplt. ¶¶53, 55, 57), and so forth – represent the embodiment of "generalized grievances,"

15   particularly because the claims are not framed in terms of alleged violations of any specific statutory or

16   regulatory requirements that authorize or govern the actions by each of the Defendant agencies at issue.

17   And, the types of injuries that Plaintiffs seek to redress (*see, e.g.*, Cmplt. ¶71– alleging that climate change

18   will "threaten our planet's habitability for humans as well as countless other species") could potentially be

19   suffered by virtually every person (and creature) in the United States and, indeed, in most of the world.

20   Principles of prudential standing counsel strongly in favor of leaving the resolution of such widely-shared

21   claims to the political Branches.  *See Sierra Club v. U.S. Def. Energy Supp. Ctr.*, No. 01-11-cv-41, 2011

22   WL 3321296, at *7 (E.D. Va. July 29, 2011) (dismissing claim that federal agency's fuel purchasing will

23   affect plaintiffs "via the generalized risk associated with global warming" as "exactly the type of claim

24   prudential standing requirements caution against.").[2]/

25         Plaintiffs' public trust claim is quintessentially appropriate for political or regulatory – not judicial –

26

27

---

28  [2] In addition to dismissing the case on prudential standing grounds, the *Sierra Club* court held that the plaintiffs had failed to demonstrate Article III standing.

resolution, because it simultaneously implicates many competing interests of almost unimaginably broad

categories of both potential plaintiffs and potential defendants.  On Plaintiffs' side, the few individuals and

organizations bringing this suit are a tiny subset of those who could allege they are injured by greenhouse

gas emissions that have contributed or will contribute to global climate change. Parallel breadth and

complexities also characterize the range of potential governmental defendants.  The types and number of

government entities that emit, regulate or otherwise impact (or that could *potentially* regulate or otherwise

impact) greenhouse gases, and thus contribute actively or passively to climate change as alleged, are

capacious.

The multiplicity of potential plaintiffs and defendants is rendered especially troubling by the very

nature of a common law public trust claim seeking to halt climate change.  The problem is not simply that

many plaintiffs could bring such claims and that many defendants could be sued; it is also that essentially

any potential plaintiff could claim to have been injured by any (or all) of the potential defendants' actions or

failures to act. The medium transmitting injury to potential plaintiffs is the Earth's entire atmosphere,

making it impossible to consider the sort of focused and more geographically proximate effects that were

characteristic of traditional common law suits – nuisance claims, not public trust cases – targeted at

particular nearby sources of water or air pollution.  *See, e.g. Illinois v. Milwaukee*, 406 U.S. 91 (1972)

(nuisance action concerning discharges into Lake Michigan).[10]/ Other common law (nuisance) cases that

reached the Supreme Court long predated the CAA or other environmental laws Congress has enacted and,

unlike this case, involved localized, not global effects.  *See, e.g., Georgia v. Tenn. Copper Co.*, 206 U.S.

230 (1907).

In the climate change context, legislative and regulatory actions are far better suited to address the

scope of the problem and to fashion an appropriately tailored set of remedies than a potentially open-ended

series of common law suits in far-flung courts.  But even a single common-law proceeding would be a less

efficient, effective, manageable, and – most importantly – accountable mechanism to consider questions

such as how much the Nation's greenhouse gas emissions should be reduced to address global climate

change; how much of the burden of reducing worldwide greenhouse gas emissions should be borne by the

---

[10] *Milwaukee II* held that the water pollution claim previously recognized had been preempted.

1  United States; whether and to what extent the United States should provide technical or financial assistance

2  to other countries to support their efforts to reduce greenhouse gas emissions; which federal agencies

3  should promulgate regulations, or alter their priorities or modes of operation, and how; what is the

4  appropriate level of funding for such efforts and how will tax or other revenues be generated to pay for

5  those efforts; at what rate and for how long should emissions reductions occur; and a host of other

6  questions squarely raised by Plaintiffs' suit.  As the Supreme Court made clear in *AEP*, courts are ill-suited

7  to balance the various interests of, and the burdens to be borne by, the many entities, groups, and sectors of

8  the economy that, although not parties to this litigation, are affected by a phenomenon that spans the globe.

9  The problem is compounded when, as here, the plaintiffs are relying on a common law theory rather than a

10  statute or regulation that would provide express guidance to courts in this complex arena.

11        The establishment of appropriate levels for the reduction of $CO_2$ emissions in the United States ("at

12  least 6% per year beginning in 2013," as Plaintiffs request in their Prayer for Relief, ¶2.b), would entail

13  multifarious policy judgments, which should be made by decisionmakers who are politically accountable,

14  have expertise, and are able to pursue a coherent national or international strategy.  *Cf. Massachusetts,* 549

15  U.S. at 524 ("[Agencies] whittle away at [massive problems] over time, refining their preferred approach as

16  circumstances change and as they develop a more nuanced understanding of how best to proceed.").  For

17  such reasons, courts accord the highest levels of deference to Executive Branch agencies' application of

18  their regulatory and scientific expertise and policy judgment to address complex technical and legal

19  problems.  *See, e.g., Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837 (1984).

20        Plaintiffs avow that EPA and the other Defendant agencies have violated their alleged public trust

21  duty by failing to effectively implement and enforce the laws under their jurisdiction.  (Cmplt. ¶53).  They

22  ask this Court to intervene and essentially act as a "super-regulator" by ordering six select Defendant

23  agencies and "each of them" to "take action" that would "enable global $CO_2$ emissions to peak" by

24  December 2012 and also "take all necessary actions" to reduce $CO_2$ emissions in the United States as a

25  whole by at least 6% per year beginning in 2013.  (Prayer for Relief, ¶¶2.a. & b).  But the myriad questions

26  associated with developing a judgment about reasonable levels of greenhouse gases are more properly

27  answered by EPA, the agency Congress charged with the responsibility to regulate air pollution and with

28  significant expertise in the scientific disciplines that must be brought to bear on the matter.

1    In the CAA, Congress created a regime under which EPA and state regulators determine the best

2    means of regulating air pollutants.  *See AEP*.  And since the Supreme Court held in *Massachusetts v. EPA*

3    in 2007 that $CO_2$ falls within that regulatory authority, EPA has taken significant steps toward reducing $CO_2$

4    emissions and addressing climate change.  *See* discussion, Background, Part C, *supra*.  That publicly

5    accountable regulatory process is far preferable to what would result if district courts – acting separately

6    and without the benefit of statutory or regulatory guidance – were to use common law public trust doctrine

7    cases as opportunities to sit as arbiters of scientific and technology-related disputes and as de facto super-

8    regulators not only of sources of pollution (not just within their districts, but nationwide) but of the

9    regulators themselves.  *Id.* at 14.  *Cf. North Carolina, ex rel. Cooper v. TVA*, 615 F.3d 291, 296 (4th Cir.

10   2010) (observing, in a suit involving a state common law claim, that "encourag[ing] courts to use vague

11   public nuisance standards to scuttle the nation's carefully created system for accommodating the need for

12   energy production and the need for clean air" would result in "a balkanization of clean air regulations and a

13   confused patchwork of standards, to the detriment of industry and the environment alike").

14   In sum, the confluence here of many factors – including the countless potential plaintiffs and

15   defendants, the lack of judicial manageability, complexity of the scientific issues, and the unusually broad

16   array of underlying policy judgments that would need to be made – demonstrates that Plaintiffs' concerns

17   about climate change must be resolved in the first instance by the Legislative and Executive Branches,

18   subject to appropriate judicial review.  The Complaint should be dismissed on prudential standing grounds.

19   **B.   Plaintiffs Lack Article III Standing Because Their Claim Is Not Redressable**

20   Because the federal judiciary's role is limited to resolving cases and controversies, U.S. Const. art.

21   III, § 2, courts must determine in each case whether a plaintiff has standing to bring its claim.  Here,

22   Plaintiffs advance a sprawling claim alleging that the United States has violated its fiduciary duties as a

23   "trustee" to protect the atmosphere as a commonly shared "public trust asset" and refrain from taking

24   actions that "waste or damage" such asset.  Plaintiffs contend they can enforce these alleged duties because

25   they are "citizen beneficiaries" of the public trust and represent "present and future generations." (Cmplt.

26   pp. 38-40.)

27   In assessing whether Plaintiffs have demonstrated Article III standing, it should be recognized at the

28   outset that the Supreme Court's *Massachusetts* decision, which turned on that case's unique circumstances,

1  does not govern here.  In *Massachusetts*, a group of private organizations petitioned EPA to begin

2  regulating emissions of four greenhouse gases, arguing that rising global temperatures and climatological

3  changes resulted from an increase in the atmospheric concentration of greenhouse gases.  After EPA denied

4  the petition, the petitioners – joined by the Commonwealth of Massachusetts – sought judicial review.  EPA

5  argued that the petitioners had failed to demonstrate a concrete and particularized injury required to show

6  Article III standing.  After the D.C. Circuit upheld EPA's denial of the petition, the Supreme Court

7  reversed, concluding that at least some of the petitioners had standing.

8       The Supreme Court explained, however, that its ruling was based on the uniqueness of the case

9  before it.  First, the Court found it to be "of considerable relevance" that the party seeking review was a

10  "sovereign State," not a "private individual."  549 U.S. at 518.  The Court thought it critical that

11  Massachusetts sought to assert its own rights as a state under the CAA, and was not seeking to protect the

12  rights of its citizens.  *Id.* at 520 n.17.  Under those circumstances, the Court afforded Massachusetts

13  "special solicitude" due to the State's interests in ensuring the protection of the land and air within its

14  domain, and its "well-founded desire to preserve its sovereign territory."  *Id.* at 519-20.  The Court also

15  found that Massachusetts "owns a substantial portion of the state's coastal property" that had allegedly been

16  harmed by EPA's inaction, and that EPA's failure to regulate these gases could cause additional harm to its

17  shoreline.  *Id.* at 522-23.  By showing that climate change had diminished part of its shoreline,

18  Massachusetts had shown that it had been affected in a "particularized" way by EPA's failure to regulate

19  greenhouse gases.  *Id.* at 522.  Thus, the *Massachusetts* decision stands for the limited proposition that,

20  where a harm is widely shared, a sovereign, suing in its individual interest, has standing where that

21  sovereign's individual interests are harmed, wholly apart from the alleged general harm.  Plaintiffs are

22  individuals and environmental organizations, not sovereign States, and have no claim to "special solicitude"

23  under *Massachusetts*.

24       Further, the *Massachusetts* Court found significant that in the CAA, Congress had authorized

25  statutory review of the EPA actions in question: "The parties' dispute turns on the proper construction of a

26  congressional statute, a question eminently suited for resolution in federal court."  549 U.S. at 516.  Here, in

27  contrast, Plaintiffs' cause of action is unmoored from any statute and falls squarely within a class of cases

28  that the Supreme Court has advised must not be entertained: those seeking to "vindicate the public's non-

concrete interest in the proper administration of the laws." *Id.* at 516-17.

Outside of the factual setting of *Massachusetts*, the Supreme Court's decision in *Lujan v. Defenders of Wildlife* sets forth the test for standing. A plaintiff must demonstrate that it has suffered a concrete and particularized injury that is not just caused by, or fairly traceable to, the act challenged in the litigation but is also redressable by the court. 504 U.S. 555, 560-61 (1992). The types of redress that Plaintiffs seek – restoration of atmospheric $CO_2$ levels to less than 350 ppm this century, cessation of deforestation and deglaciation, an end to global warming, improvement of agricultural lands, and so forth – lie outside this Court's competence and jurisdiction. Plaintiffs do not cite any statute that authorizes federal courts at the behest of allegedly injured parties to enjoin "unreasonable" greenhouse gas emissions. Nor do they rely on a statutory framework specifying who may bring suit or the agency duties that are supposedly being violated, such that a court could provide redress by requiring compliance with those specific duties. Agencies, after all, are "creatures of statute" whose powers and obligations are dependent upon congressional authorization. *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 9 (D.C. Cir. 2000). Courts are not at liberty to encumber agencies with duties not contemplated by Congress. *Id.* at 9-10 ("Unless Congress delegates authority to an agency, the agency is without power to act."). And while Congress has the power to loosen the strictures of the redressability prong governing standing, *see Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), it has not done so here.

In short, Plaintiffs cannot establish that their alleged injuries are redressable in this proceeding, and therefore they lack Article III standing to press their public trust doctrine claim.

## IV. THE PUBLIC TRUST DOCTRINE DOES NOT SUPPLY A FEDERAL CAUSE OF ACTION AGAINST THE UNITED STATES AND, IN ANY EVENT, PLAINTIFFS' CLAIM DOES NOT FALL WITHIN THE BOUNDARIES OF THE DOCTRINE

While the public trust doctrine functions in some states as a constraint on a *state's* ability to alienate public trust lands and as a limitation on uses that interfere with trust purposes, the doctrine has been held not to support a valid claim under *federal* common law. *See, e.g., New York v. DeLyser*, 759 F. Supp. 982, 990 (W.D.N.Y. 1991) ("claims relating to the public trust doctrine do not 'arise under' federal law.").[11]/

---

[11] *Matter of Steuart Transp. Co.*, 495 F. Supp. 38, 40 (E.D. Va. 1980) (which Plaintiffs cite in their P/I Mem. at 12), is not to the contrary. That court held that the federal government was authorized to recover against Steuart for damage to migratory waterfowl, statutory penalties and cleanup costs following an oil

(continued...)

*See also Light v. United States*, 220 U.S. 523, 537 (1911) (stating that while "the public lands of the nation are held in trust for the people of the whole country," (citation and internal quotation omitted) "it is not for the courts to say how that trust shall be administered. That is for Congress to determine."); *Sierra Club v. Block*, 622 F. Supp. 842, 866 (D. Colo. 1985)(citing *Light* for proposition that Congress, not courts, has authority to dictate how public trust is administered, and granting federal defendant's motion to dismiss public trust claim).

But even assuming for argument's sake that the public trust doctrine could support a valid claim under federal common law – an issue this Court need not reach – Plaintiffs' climate change cause of action does not fit within that doctrine because it is not grounded on any claim that the United States improperly created a right in favor of a private party to public resources or improperly impaired any public right in such resources.[12]/ To the contrary, Plaintiffs charge that federal resource agencies – acting under congressional mandates with which Plaintiffs disagree – have allowed the public to *over-utilize* the Nation's natural resources (such as timber, oil, ore, and air), with benefits that Plaintiffs believe are far outweighed by the resulting harm to the atmosphere. Plaintiffs ask the Court to force the United States to re-order its national priorities, so that climate change takes precedence over all other competing interests, such as logging, oil production, and even the economy. Moreover, Plaintiffs ask the Court to order the Defendant agencies to act well beyond the scope of – and in many cases contrary to – the specific duties and authorities that Congress has given them pursuant to their governing statutes. Their claim falls well outside any conceivable application of the public trust doctrine. Certainly, Plaintiffs cannot cite any federal court precedent is remotely on point.

And, as *AEP* makes clear, Plaintiffs cannot state a valid claim merely by invoking federal common

---

(...continued)

spill, overruling Steuart's contention that the government lacked such authority because it did not have an "ownership" interest in the waterfowl. Nor are the several other cases cited by Plaintiffs (P/I Mem. at 12) relevant. Both *United States v. 1.58 Acres of Land*, 523 F. Supp. 120 (D. Mass. 1981), and *City of Alameda v. Todd Shipyards Corp.*, 635 F. Supp. 1447 (N.D. Cal. 1986), concerned the scope of restrictions applicable to tidelands when the United States acquired the land. None of these cases supports the notion that federal land managers are subject to fiduciary standards of stewardship beyond explicit statutory duties.

[12] *See* P/I Mem. at 15 (citing *Ill. R.R.*, 146 U.S. at 455, for proposition that, like the submerged lands at issue in that case, the atmosphere "should not be left 'entirely under the use and control of private parties.'")

law.  The Supreme Court noted that while it has in the past developed federal common law in the fields of

interstate air and water pollution, federal courts must "remain[] mindful" that they do "not have creative

power akin to that vested in Congress."  Plaintiffs advance the notion that a federal agency violates the

public trust by failing to take "bold" regulatory actions that it lacks statutory authority to take, or even by

operating as specifically contemplated by statute.  *See* Cmplt. ¶9 (agencies' general "failure to act" to stop

climate change violates trust duty); ¶55 (DOI violates duty by "permitting" grazing and logging on public

lands).  Plaintiffs' theory is not just "creative," it is unprecedented and far outside the bounds of a

legitimate federal cause of action under statute or common law.

## V.   EVEN IF PLAINTIFFS COULD STATE A FEDERAL PUBLIC TRUST CLAIM, SUCH A CLAIM IS FORECLOSED BY THE CLEAN AIR ACT AND OTHER FEDERAL ENVIRONMENTAL AND RESOURCE STATUTES AND INITIATIVES

As the Supreme Court made clear in *AEP*, the CAA displaces federal common law causes of action

against EPA seeking reduction of greenhouse gases from sources covered by the CAA.  Although Plaintiffs

wold prefer that the federal courts fashion remedies for emissions of greenhouse gases in the first instance,

Congress gave that authority to EPA instead.  A federal court may not second-guess that legislative choice

under the guise of federal common law.  Rather, a court's role arises only in the context of reviewing EPA's

final agency actions or failures to perform specific statutory duties.

Plaintiffs attack not only EPA's administration of its duties but other agencies' execution of their

statutory duties, as well.  But the public trust doctrine – to the extent it ever applied to the United States –

has been supplanted and effectively displaced by modern administrative law.  Presaging *AEP*, the D.C.

Circuit noted in its 1984 *Air Florida* decision that Congress had "legislated extensively with regard to many

of the interests which the public trust doctrine protects" (citing as examples federal laws addressing

navigation, fishing, and recreational use of waters) and that where  a "congressional scheme speaks directly

to a question which would otherwise be answered by federal common law, federal legislation 'preempts'

federal common law." 750 F.2d at 1085-86.  The D.C. Circuit added that the district court in a prior case –

*Sierra Club v. Andrus*, 487 F. Supp. 443, 445 (D.D.C. 1980), *aff'd*, 659 F.2d 203 (D.C. Cir. 1981), which

concerned DOI's obligations under the National Park Service Organic Act of 1916, 16 U.S.C. § 1, and the

Federal Lands Policy and Management Act, 43 U.S.C. §§ 1701, 1782(c) – held DOI had only statutory, not

1   common-law, trust responsibilities for public lands it administers.[13]/ *See generally* Pearson, *Public Trust*

2   *Doctrine in Federal Law*, 24 J. Land Res. & Envtl L. 173, 175 (2004) (federal courts do not use public trust

3   doctrine to "restrict the power of the federal government with respect to management of federal lands and

4   natural resources.").

5        Congress has, in a host of statutes, created a wide array of federal agencies, including Defendants

6   here and others not named, and bestowed on them various duties and responsibilities, including land use

7   and resource obligations.  In doing so, the laws pertaining to the public lands and other resources is so

8   heavily dominated by statutes that it effectively excludes room for the public trust doctrine, as Plaintiffs

9   conceive it, to operate.  The courts are not charged with broadly second-guessing how these agencies

10  operate and discharge their statutory obligations.  Rather, the courts' role arises in the context of reviewing

11  final agency actions or failures to perform specific statutory duties.  Courts, in short, do not have a roving

12  mandate to dictate how agencies should operate.  As stated in *Lujan v. NWF*, 497 U.S. 871, 894 (1990):

13       Except where Congress explicitly provides for our correction of the administrative process at  a
         higher level of generality, we intervene in the administration of the laws only when, and to the
14       extent that, a specific "final agency action" has an actual or immediately threatened effect. [citation
         omitted]

15

16  The Court acknowledged that the result is "assuredly not as swift or as immediately far-reaching a

    corrective process as those interested in systemic improvement would desire."  *Id.*  It added: "Until
17
    confided to us, however, more sweeping actions are for the other branches."  *Id.*
18
                                    **CONCLUSION**
19
         For the foregoing reasons, Plaintiffs' Complaint should be dismissed.
20
    Respectfully submitted, October 31, 2011        IGNACIA S. MORENO,
21                                                   Assistant Attorney General
                                                     Environment and Natural Resources Division
22                                                   */s/ Martin F. McDermott*
                                                     MARTIN F. McDERMOTT, Attorney
23                                                   United States Department of Justice

24

25  _____

26  [13] Because in *Air Florida* the district court had not addressed the question, the D.C. Circuit declined to
    reach the issue whether Congress had "preempted some or all of the field which a federal common-law
27  public trust doctrine would occupy."  The Court advised, however, that in any event the role of federal
28  common law is not only "very narrow" but also subject to Congress's "paramount authority."  750 F.2d at
    1085 (quoting *Milwaukee II*, 451 U.S. at 313, which quoted from *New Jersey v. New York*, 283 U.S. 336,
    348 (1931)).

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on the 31st day of October, 2011, a copy of the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** was filed and served through the

3

Court's CM/ECF system.

4

*s/ Martin F. McDermott*
Trial Attorney, U.S. Department of Justice

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28