1  IGNACIA S. MORENO, Assistant Attorney General
   United States Department of Justice
2  Environment & Natural Resources Division

3  MARTIN F. McDERMOTT (SBN 6183307 (IL))
   United States Department of Justice
4  Environment & Natural Resources Division
   Environmental Defense Section
5  P.O. Box 23986
   Washington, D.C.  20026-3986
6  martin.mcdermott@usdoj.gov
   Tel: (202) 514-4122

7

8              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF CALIFORNIA
9                      SAN FRANCISCO DIVISION

10 _____
                                      )
11 ALEC L., et al.,                   )
                                      )
12            Plaintiffs,             )        Case No.: 4:11-cv-02203 EMC
                                      )
13       v.                           )
                                      )        Date: December 15, 2011
14 LISA P. JACKSON, et al.,           )        Time: 3:00 p.m.
                                      )        Place: Courtroom 5, 17th Floor
15            Defendants.             )
   _____)

16              **DEFENDANTS' REPLY**
17     **IN SUPPORT OF THEIR MOTION TO DISMISS**

18       Defendants Lisa P. Jackson in her official  capacity as Administrator of the U.S. Environmental

19 Protection Agency ("EPA"), Kenneth L. Salazar in his official capacity as Secretary of the U.S. Department

20 of the Interior ("DOI"), Thomas J. Vilsack in his official capacity as Secretary of the U.S. Department of

21 Agriculture ("USDA"), Gary F. Locke in his official capacity as Secretary of the U.S. Department of

22 Commerce ("Commerce"), Steven Chu in his official capacity as Secretary of the U.S. Department of

23 Energy ("DOE"), and Leon E. Panetta in his official capacity as Secretary of the U.S. Department of

24 Defense ("DOD"), file this Reply in Support of Defendants' Motion to Dismiss the First Amended

25 Complaint for Declaratory and Injunctive Relief (hereinafter the "Complaint," or "Cmplt.") (Doc. 4) filed

26 by Plaintiffs Alec L., Madeline W., Garrett and Grant S. and Zoe J. (by and through their guardians ad

27 litem), Kids vs Global Warming, and Wildearth Guardians ("Gaurdians" in Complaint's caption and text

28 (p. 13)).

1

## **TABLE OF CONTENTS**

2

3  INTRODUCTION ........................................................................................... 1

4  I.  THE UNITED STATES HAS NOT WAIVED SOVEREIGN
       IMMUNITY HERE ............................................................................ 2
5

6  II.  THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFFS'
        CLAIM .............................................................................................. 4

7  III.  PLAINTIFFS LACK STANDING TO ASSERT THEIR FEDERAL
         COMMON LAW PUBLIC TRUST DOCTRINE CLAIM ................. 8
8

9        A.  Plaintiffs Lack Prudential Standing ........................................ 8

10       B.  Plaintiffs Also Lack Article III Standing Because Their
             Claim Is Not Redressable ...................................................... 11

11  IV.  THE PUBLIC TRUST DOCTRINE DOES NOT SUPPLY A
         FEDERAL CAUSE OF ACTION AGAINST THE UNITED STATES
12       AND, IN ANY EVENT, PLAINTIFFS' CLAIM DOES NOT FALL
         WITHIN THE BOUNDARIES OF THE DOCTRINE ....................... 12
13

14  V.  EVEN IF PLAINTIFFS COULD STATE A FEDERAL PUBLIC
        TRUST CLAIM, SUCH A CLAIM IS FORECLOSED BY THE
        CLEAN AIR ACT AND OTHER FEDERAL ENVIRONMENTAL
15      AND RESOURCE STATUTES AND INITIATIVES ....................... 14

16  CONCLUSION ............................................................................................. 15

17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF AUTHORITIES

2

3 CASES

4 *Am. Elec. Power Co., Inc. v. Connecticut*, 131 S. Ct. 2527 (2011) ........................... 1, 10, 11, 14

5 *Baker v. Carr*, 369 U.S. 186 (1962) ..................................................................... 4, 5

6 *Berdeaux v. U.S. Dep't of Educ. Loan Discharge Unit, S.F., CA,*

7    No. CV 10-1737-PHX-JAT, 2011 WL 3876001 (D. Ariz. Sept. 2, 2011) .................... 4

8 *City of Alameda v. Todd Shipyards Corp.*, 635 F. Supp. 1447 (N.D. Cal. 1986) ................ 14

9 *Consejo de Desarrollo Economico de Mexicali v. United States,*

10    482 F.3d 1157 (9th Cir. 2007) ...................................................................... 4

11 *Dist. Of Columbia v. Air Fla., Inc.,* 7509 F.2d 1077 (D.C. Cir. 1984) ......................... 12

12 *Ill. Cent. R.R. Co. v. Illinois,* 146 U.S. 387 (1892) ......................................... 13

13 *In re Delta Smelt Consolidated Cases*, 663 F. Supp. 2d 922 (E.D. Cal. 2009) ................. 12

14 *Kleppe v. New Mexico,* 426 U.S. 529 (1976) .................................................... 14

15 *Light v. United States*, 220 U.S. 523 (1911) .................................................. 14

16 *Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) .......................................... 11

17 *Marbury v. Madison*, 5 U.S. 137 (1803) ......................................................... 3

18 *Massachusetts v. EPA,* 549 U.S. 497 (2007) ..................................................... 12

19 *Matter of Steuart Transp. Co.*, 495 F. Supp. 38 (E.D. Va. 1980) ............................... 14

20 *United States v. 1.58 Acres of Land*, 523 F. Supp. 120 (D. Mass. 1981) ........................ 14

21 *United States v. Trinidad Coal Co.,* 137 U.S. 160 (1890) ....................................... 13

22 *Veterans for Common Sense v. Shinseki*, 644 F.3d 845 (9th Cir.), reh'g en banc granted,

23    No. 08-16728, 2011 WL 5574937 (9th Cir. Nov. 16, 2011) ................................... 3

24

25 STATUTES

26 5 U.S.C. § 702 .................................................................................... 3

27

28

1

**MISCELLANEOUS**

2  *Advancing the Sovereign Trust of Government to Safeguard the Environment for Present*
3      *And Future Generations (Part I): Ecological Realism and the Need for a Paradigm Shift,*
       39 Envtl. L. 43 (2009) ................................................................................................ 6

4  Paul R. Epstein, *Bringing Climate Change into Global Governance* (2010),

5      http://www.thesolutionsjournal.com/node/579, at 1 ................................................ 11

6  Pushker Kharecha, Ph.D., *Options for Near-Term Phaseout of CO2 Emissions from Coal*

7      *Use in the United States,* Environ. Sci. Technol. 2010 at 4059 ................................ 7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiffs seek unprecedented relief.  They ask this Court for a raft of judicial declarations – many unclear or advisory – such as that the United States government is legally obligated to "take action pursuant to its common but differentiated responsibility and respective capabilities" and is subject to a fiduciary duty that "is dictated by the best available science on protecting a sustainable atmosphere and climate for present and future generations."  (Cmplt. 38-39.)  Plaintiffs also seek declarations that are prescriptive in nature, such as one pronouncing that the United States government "must both reduce its own emissions and provide financial and technological assistance to developing countries to support them in reducing their own emissions, at an aggregate rate consistent with a rate of global emissions decline of six percent per year." (*Id.* 39, presumably referring to emissions of carbon dioxide ($CO_2$)).  Furthermore, Plaintiffs do not limit their requested relief to mere judicial pronouncements.  They ask this Court to impose far-reaching injunctive obligations on six federal agencies in the form of a mandatory injunction that would, among many other things, order the agencies to take actions "consistent with" the federal government's "equitable share of the global effort," and thereby "enable global $CO_2$ emissions to peak by December 2012" and "decline" by at least 6% per year thereafter.  (*Id.*).

As detailed in Defendants' opening memorandum in support of their motion to dismiss ("U.S. Mem."), Plaintiffs' claim is barred both by the absence of any waiver of sovereign immunity and the political question doctrine.  Plaintiffs lack prudential standing because their suit is comprised of generalized grievances more appropriately addressed by the Legislative and Executive Branches, and they lack Article III standing because they cannot demonstrate that their alleged injury is redressable by the Court.  Further, it is not possible to state a federal cause of action such as Plaintiffs' against the United States based on the public trust doctrine, and in any event this claim falls well outside the bounds of that doctrine.  Finally, this Court need not decide whether Plaintiffs have stated a valid federal common law claim because, as the Supreme Court made clear in its recent decision in *American Electric Power Co., Inc. v. Connecticut*, 131 S. Ct. 2527 (2011) ("*AEP*"), the Clean Air Act and other federal statutes displace such a claim.

In their Opposition, Plaintiffs denigrate these fundamental limitations on the powers of the Judiciary under our system of government as mere "procedural" "hurdles" or "obstacles" (Pl. Opp. 1, 21) that do not apply in the context of litigation over the "public trust," which, according to a law professor they quote (*id.*

2), is "inherent in the nature of sovereignty and [is] therefore enforceable as [a] limit on federal action." They also strive to minimize the nature of the judicial intervention they are seeking. But the Court should not be deceived. While they sometimes assert that all they are asking for is an "accounting" of the government's actions impacting climate change and a "plan to achieve asset protection" (Pl. Opp. 19) – neither of which this Court has jurisdiction to order – it is plain that they expect far more from this Court. Although Plaintiffs' Opposition does not go into the details of how the Court would implement the desired "climate recovery plan" injunction, their Complaint does. In ¶ 22, they explain that Defendants would be given 120 days to prepare and submit the plan, with "progress reports" every 30 days. If Defendants are unable to work out the details of a "mutually acceptable remedial plan" on that time frame, they would, within seven days, jointly submit to the Court "any parts of such plan that have been agreed to," or a statement that Defendants were unable to agree to any aspect of a plan. "Representatives of Plaintiffs shall then make recommendations to the Court with respect to any remaining areas of disagreement," and although Plaintiffs do not explain what happens next, the Court would presumably need to figure out in very short order what a good plan would consist of, and then order its implementation under threat of contempt. *Id.*

In any event, Plaintiffs are clear that as part of this process, the Court would (1) be ordering the Defendant agencies (or the United States government as a whole – Plaintiffs are not clear on that point) to meet a draconian "emissions trajectory," "prohibiting significant deviation from a benchmark mitigation scenario" requiring a minimum 6% annual reduction of $CO_2$ and guaranteeing global $CO_2$ levels of 350 ppm by the end of this century. (*See* Pl. Prelim. Inj. Motion at 1). Plaintiffs also make clear that they expect the Court to retain jurisdiction over the matter until the Court "is satisfied that all public trust violations have been effectively rededicated." (Cmplt. ¶ 22). Such demands are unprecedented and must be rejected. The relief that Plaintiffs so casually request would hopelessly entangle this Court in scientific, technical, economic and policy questions, while obliterating the line that separates the Judicial Branch from the Executive and Legislative Branches.

## I.   THE UNITED STATES HAS NOT WAIVED SOVEREIGN IMMUNITY HERE

Plaintiffs' initial rejoinder to the proposition that the United States is immune from suit because Congress has not waived sovereign immunity for their claim is the remarkable one – made without any

1    citation to authority – that sovereign immunity simply "does not apply in a suit against a sovereign trustee

2    by the citizen beneficiaries of the trust." (Pl. Opp. 7).  In Plaintiffs' view, while an inability to establish that

3    immunity has been waived might pose an obstacle to review in other cases, such failure is irrelevant here

4    because a finding that "sovereign immunity precludes this action would effectively strip the beneficiaries of

5    their *lawful right* to seek judicial enforcement of the trustees' fiduciary duties and thereby violate one of the

6    most fundamental rights of established trust law." (*Id.* 8, emphasis added).  In other words, Plaintiffs

7    believe that no waiver is necessary if the claim is important enough.  They offer no support for that notion.

8             In a variation on that argument (*id.* 8), Plaintiffs state that the public trust doctrine, "as a judicially

9    enforced doctrine, unequivocally *expresses* a waiver of any claimed immunity by the sovereign from suit by

10   the beneficiaries." (*Id.* 8, emphasis added).[1]/  This argument appears to be that while a waiver might be

11   necessary, such waiver exists implicitly in the trust doctrine itself.  Plaintiffs' effort to clarify what they

12   mean by these formulations just obfuscates matters:  "The right to protection of the trust res is vested in the

13   people by virtue of the sovereignty of our federal government." (*Id.* 8).  Suffice it to say that the support

14   that Plaintiffs offer for these propositions – *Marbury v. Madison*, 5 U.S. 137, 163 (1803), and its famous

15   edict that the United States is a "government of laws, and not of men" – is not on point.[2]/

16            Plaintiffs next argue that even if sovereign immunity would otherwise bar their claim, the United

17   States has waived its immunity here.  They cite "28 U.S.C. § 702" for that proposition (Pl. Opp. 9), but no

18   such provision exists.  Presumably, Plaintiffs intended to cite Administrative Procedure Act ("APA")

19   section 702, found at 5 U.S.C. § 702, because they go on to argue that APA section 702 contains the

20   applicable waiver of sovereign immunity for their public trust claim, relying on *Veterans for Common*

21   *Sense v. Shinseki*, 644 F.3d 845 (9th Cir. 2011).  However, on November 16, 2011, the Ninth Circuit issued

22   an order in that case granting rehearing en banc pursuant to Circuit Rule 35-3, and directing that the panel's

23   opinion not be cited as precedent by or to any court of the Ninth Circuit.  *See* 2011 WL 5574937 (9th Cir.

24   _____

25   _____

26   [1] Plaintiffs do not dispute that the Supreme Court has continually reaffirmed vitality of sovereign immunity,
     but note that a law review commentator has described the doctrine is an "anachronism." (Pl. Opp. 8, n.3).

27

28   [2] Plaintiffs' other proffered support is a handful of state court decisions addressing state, not federal, law.
     *See* Pl. Opp. 8-9.

1  Nov. 16, 2011) (No. 08-16728).

2       Plaintiffs also cite *Consejo de Desarrollo Economico de Mexicali v. United States*, 482 F.3d 1157

3  (9th Cir. 2007), but that decision undercuts their argument. (Pl. Opp. 10). In that case, which involved

4  alleged federal violations of common law water rights, the Ninth Circuit held that "[a]bsent any relevant

5  statute on which to judge the legality of the agency's actions, § 702 is inapplicable and cannot be invoked

6  as a waiver of sovereign immunity." 482 F.3d at 1174. Plaintiffs here do not rely on any statute for their

7  common law claim, and therefore cannot rely on section 702.

8       To the extent that Plaintiffs are arguing that APA section 702 can be viewed as waiving sovereign

9  immunity for *constitutional* claims against the United States, Plaintiffs' public trust claim is not a

10  constitutional one. Although Plaintiffs sometimes mention the Constitution when discussing the public

11  trust doctrine, they characterize the doctrine not as constitutional in nature but as "an attribute of

12  sovereignty" that, "like the Constitution," "overlays all other acts of government." (Pl. Opp. 10). *See also*

13  Pl. Opp. 18 (similarly describing public trust doctrine not as constitutionally-based but as "an attribute of

14  sovereignty and like the Federal and State Constitutions, it overlays all other acts of government.").

15       Plaintiffs' attempt to assert that their Complaint can somehow be read as alleging a waiver of

16  sovereign immunity – albeit, at most, an implied one – should be rejected for yet another reason. Like the

17  complaint in *Berdeaux v. U.S. Dep't. of Educ. Loan Discharge Unit, SF, CA*, No. CV 10-1737-PHX-JAT,

18  2011 WL 3876001 (D. Ariz. Sept. 2, 2001), the Complaint filed here does not allege the APA as a basis for

19  subject matter jurisdiction. Based on such a failure, the *Berdeaux* court dismissed the complaint in that

20  case, stating: "Plaintiff's failure to include an APA claim in the Complaint (or even a citation to the APA)

21  bars Plaintiff from relying on the APA as a basis of jurisdiction." *Id.* at *9. The same result should obtain

22  here.

23  **II.   THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFFS' CLAIM**

24       Now that Plaintiffs have elaborated on their legal theory in their Opposition, it is even more

25  apparent that their claim is unfit for judicial resolution under the political question doctrine, which is

26  primarily a function of the separation of powers. *Baker v. Carr*, 369 U.S. 186, 210 (1962). As explained in

27  Defendants' opening brief (U.S. Mem. 11-15), while many of the *Baker* factors exist here, this case raises

28  the highest concerns with respect to the lack of "judicially discoverable and manageable standards" and the

1  "impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial

2  discretion." 369 U.S. at 217.  To the extent they even address the issue, Plaintiffs offer scant comfort that

3  there are any standards at all to guide the Court in adjudicating their claim and no reason to believe that

4  their claim could be addressed without entangling the Court in abstract policy disagreements.

5      Plaintiffs' far-flung liability theory would provide virtually every person, organization, and company

6  with a claim against any federal agency that either consumes resources or that takes action (or that could

7  take action) that could have any effect on climate change – *i.e.*, every federal agency in existence.  To

8  resolve Plaintiffs' claim, this Court would need to consider and rule on a multitude of complex, and

9  far-reaching technological, economic, scientific, and policy issues.  It would also require this Court to make

10  exceedingly difficult predictive judgments in determining whether and to what extent the United States in

11  general or each agency individually should be held liable, under vague and shifting notions of what

12  constitutes fulfillment of an alleged trust duty, for some share of the injuries associated with global climate

13  change.  Among other things, Plaintiffs want this Court to take on a monumental task for which it is ill-

14  equipped:  adjudicating how each agency must limit its own emissions, and how each must reorder its

15  priorities and rewrite its regulations in order to, among other things, somehow "enable" "*global*" $CO_2$

16  emissions to "peak" in 2012 and decline at least 6% a year "thereafter." (Cmplt. p. 39) (emphasis added).

17  Under Plaintiffs' theory, the Court would be entangled in this process for decades to come, as it enforces its

18  mandates and decrees.

19      It would be disingenuous, at best, to suggest that there are manageable standards for such a judicial

20  endeavor.  It would be absurd to deny that such an effort would require the Court to make one complex

21  policy determination after another.  And it would be sheer fantasy to view the burden that Plaintiffs ask this

22  Court to take on as anything less than Herculean.  Yet Plaintiffs blithely ask the Court to ignore these

23  realities because they "have a right to be heard." (Pl. Opp. 21).

24      In asserting that the political question doctrine does not prevent this Court from hearing their claim,

25  Plaintiffs offer (without citation to authority) the circular argument that federal courts "necessarily have

26  jurisdiction to hear public trust cases, as it is a judicially created and enforced doctrine." (*Id.* 10).  Yet, the

27  opposite is true.  Judicial self-restraint is particularly appropriate where, as here, a court is being asked to

28

1    entertain a cause of action based on federal common law that is itself fashioned by the Judiciary.[3]/

2        In an effort to convince the Court that their claim does not run afoul of the political question

3    doctrine, Plaintiffs downplay how radical their cause of action and requested relief are.  For example, they

4    assert (*id.* 12) that if their requested relief is granted, this Court "will not be imposing policy decisions on

5    agencies, or otherwise directing how an agency exercises its discretion, as the Federal Defendants would

6    have this Court believe."  In their next sentence, however, they undercut that assertion by affirming that

7    "this Court would *enforce those obligations and duties imposed* on the Federal Defendants, as trustees of

8    the public trust res in protecting the atmosphere's energy balance."  (*Id.*, emphasis added).

9        In responding to the question they themselves pose – "How will this Court enforce these obligations

10   and duties?" (*id.* 12) – Plaintiffs offer the following path forward:  "By reviewing the plethora of case law

11   that analyzes public trust duties and creates appropriate remedies; by considering evidence presented,

12   including expert testimony, by all parties; by using its sound judgment regarding the Federal Defendant's

13   fiduciary duties to the public trust; and by fashioning an order that does not compel the Federal Defendants

14   to adopt a particular plan."  Needless to say, these vague formulations hardly offer a roadmap that would

15   allow this Court to navigate and resolve this dispute without becoming completely entangled in policy

16   questions.  As regards the first formulation, there is no federal case even remotely on point that the Court

17   could "review" to guide it along the unprecedented trail that Plaintiffs want the Court to blaze.  As for the

18   remaining formulations, they amount to little more than untenable assertions that this Court will encounter

19

20

---

21   [3] Although Plaintiffs' instant case is limited to their contention that the atmosphere is covered by the public
     trust doctrine, the logic of their argument would arguably extend public trust protection to every natural
22   resource and would open the floodgates to additional unmanageable litigation.  In fact, one of the
     commentators that Plaintiffs cite in support of their theory, Mary Christina Wood, argues for just such an
23   approach: "[I]t is difficult to find any resource that can be summarily excised from public trust treatment.
     The soils, never a subject of past public trust cases, now seem indispensable, because they provide valuable
24   carbon sinks and are also necessary for local food supplies. The wetlands and coastal areas are essential for
     storm barriers. The forests are crucial carbon sinks. The bees are vital components of agriculture. If, indeed,
25   the body of public trust law is designed to protect society and assure the natural infrastructure necessary for
     the citizens' survival and prosperity, it can no longer be built around artificial categories. A holistic
26   approach would recognize the people's interests in all resources sustaining ecological balance – i.e., all
     natural resources." *Advancing the Sovereign Trust of Government to Safeguard the Environment for*
27   *Present and Future Generations (Part I): Ecological Realism and the Need for a Paradigm Shift,* 39 Envtl.
     L. 43, 83-84 (2009).
28

no difficulty discharging its new role as "super-enforcer" (*id.* 20) of the Nation's domestic and international climate change responsibilities because the Court has "sound judgment" and because Plaintiffs' experts will explain at trial everything that the Court needs to know to formulate national policy. And, while it is true that Plaintiffs are not – at least at this early juncture – requesting the Court to compel the United States to adopt a "particular" plan, that does not make their claims any less policy driven. Their Prayer for Relief (Cmplt. 38-40), for example, asks this Court to declare that the United States must act "collaboratively" to: "enable" global fossil fuel $CO_2$ emissions to "peak" by 2012; reduce such emissions by at least 6% per year through at least 2050; and cease "deforestation and reforest degraded forest lands and improve soil conditions on agricultural lands that will sequester an additional 100 gigatons of carbon this century." It should be obvious from the sprawling nature of that request that Plaintiffs' assertion (Pl. Opp. 12) that resolving such issues would "not require initial policy determinations" does not accord with reality.

As for Plaintiffs' contention that policy determinations can be avoided because the trial testimony would be offered by "experts" advocating nothing but the "best science," that notion also cannot be squared with reality. For example, Plaintiffs have filed a declaration from Pushker Kharecha, Ph.D. (Doc. 32) in connection with their preliminary injunction motion. He is one of the "experts" who supports what Plaintiffs refer to as the "mitigation scenario," pursuant to which Plaintiffs would have this Court impose on the government a requirement that the United States take actions that would somehow cause *global* emissions to "peak" in 2012. Doc. 32 at 14. In one of the papers listed in Dr. Kharecha's references, *Options for Near-Term Phaseout of $CO_2$ Emissions from Coal Use in the United States*, Environ. Sci. Technol. 2010 at 4059, he writes that the climate change problem would become "tractable" if $CO_2$ emissions from coal use are "phased out rapidly and emissions from unconventional fossil fuels (*e.g.*, oil shale and tar sands) are prohibited." He also states in that paper that: "Eliminating coal emissions also requires improved efficiency, a "smart grid," additional energy storage, and advanced nuclear power." He adds: "Tax policy, energy efficient regulations, and utility profit motives must be altered to achieve rapid phaseout of coal emissions." No serious argument can be made that the Court would not be engaged in policy determinations of the highest order were it to put itself in the position of ordering the government to prepare a "climate recovery plan" mandating features such as a carbon tax, outright prohibitions on certain energy sources, or mandates for nuclear power, and then supervising the enforcement of that plan against

1  the United States in ongoing proceedings throughout the remainder of this century.

2      Another of Plaintiffs' declarations provides further proof, if any is needed, that Plaintiffs are asking

3  this Court to transgress the Judicial Branch's proper limits and craft and enforce government policy on

4  climate change.  In his Declaration (Doc. 45), Arjun Makhijani, Ph.D., states (at 1) that "with the right

5  policies," it is feasible to transition to an "energy system that is fully renewable or nearly so" by 2050.  He

6  offers his view that the "appropriate public policies" that are "needed to make a transition" include among

7  other things a "carbon tax" and a "carbon-neutral federal government by 2030." *Id.* 4.  He also provides

8  that the "purpose of his declaration" is to "provide evidence that it is technically and economically feasible

9  to accomplish a near-total elimination of fossil fuels" by 2050, and that a "somewhat faster phaseout" may

10  be possible "if policies were determined enough." (*Id.* 6).  Dr. Makhijani adds that, in his view, the main

11  obstacle to achieving rapid reduction in $CO_2$ emissions from the energy sector" is "the lack of a clear

12  government policy to drastically reduce $CO_2$ emissions to protect climate." *Id.* 49.

13      Perhaps inadvertently, Plaintiffs acknowledge in their discussion addressing displacement that their

14  claim is inherently policy-based.  They state:  "A sovereign would have to consider, balance and implement

15  other types of policy (such as tax incentives, land use reform, infrastructure changes and a host of other

16  measures) to carry out the fiduciary obligation of achieving 6% annual $CO_2$ emissions reduction." (Pl. Opp.

17  20).  But even without that concession, the separation-of-powers problems raised by Plaintiffs' liability

18  theory are obvious.  Determining appropriate restrictions on greenhouse gas emissions is a task suited for

19  resolution by the non-judicial Branches, which possess the requisite scientific and technical expertise and

20  centralized decisionmaking authority and are politically accountable.  Development by the Judiciary of a

21  superceding (or parallel) system of common-law regulation of greenhouse gas emissions would frustrate

22  and complicate ongoing and future legislative and regulatory undertakings.

23  **III.  PLAINTIFFS LACK STANDING TO ASSERT THEIR FEDERAL COMMON LAW
24        PUBLIC TRUST DOCTRINE CLAIM**

25      Plaintiffs lack both prudential standing, which embodies judicially self-imposed limits on the

26  exercise of federal jurisdiction, and Article III standing.

27      **A.    Plaintiffs Lack Prudential Standing**

28      Plaintiffs lack prudential standing because their claim is composed of generalized grievances more

appropriately addressed by the Legislative and Executive Branches. They seek relief under the common law by suing a handful of federal agencies from among an almost limitless array of governmental entities that either emit greenhouse gases or otherwise impact or affect (directly or indirectly) atmospheric $CO_2$ levels. The alleged improper agency conduct – failing to "effectively implement and enforce" the law (EPA), allowing "oil, coal and electric infrastructure and transmission facilities on public land" (DOI), "permitting large-scale logging in national forests" (USDA) (Cmplt. ¶¶ 53, 55, 57), and so forth – represent textbook examples of generalized grievances, particularly because the claims are not framed in terms of alleged violations of any statutory or regulatory requirements that authorize or govern action by each of the agencies at issue. And, the types of injuries that Plaintiffs seek to redress could potentially be suffered by virtually everyone in the world. Prudential standing principles dictate leaving resolution of such widely-shared claims to the other Branches.

Plaintiffs, in a gross understatement, respond that "democracy may *seem* undermined when a court overrules the acts of elected officials," but then proceed to urge the Court to do just that because "such judicial acts actually serve democracy by preserving rights invested to all trust beneficiaries." (Pl. Opp. 8, emphasis added). Although the meaning of the latter formulation is not clear, what is clear is that Plaintiffs want this Court to usurp the functions of the representative Branches. In the climate change context, however, legislative and regulatory actions are far better suited to address the scope of the problem and to fashion an appropriately tailored set of remedies than a common law proceeding such as this. The weighty questions Plaintiffs want to address at a trial – such as how much the Nation's greenhouse gas emissions should be reduced to address global climate change; how much of the burden of reducing such emissions worldwide should be borne by the United States; whether to provide international aid to support efforts to reduce such emissions; which federal agencies should promulgate regulations, or fundamentally alter their priorities or modes of operation, and how; what is the appropriate level of federal funding for such efforts and how will tax or other revenues be generated to pay for those efforts; at what rate and for how long should emissions reductions occur – must be left to the representative Branches, notwithstanding Plaintiffs' belief that Congress and the President are acting with insufficient dispatch in this arena.

Plaintiffs fail to seriously address these arguments in their one and one-half page rejoinder on this issue. They rely on a handful of state court cases for the proposition that "state jurisprudence has long

1  recognized standing for plaintiffs challenging violation of the public trust (Pl. Opp. 15)," and assert,

2  inaccurately, that the Supreme Court in *AEP* "did not accept" prudential standing arguments "to defeat

3  standing." (Pl. Opp. 16). In fact, the Supreme Court did not reach the government's prudential standing

4  argument in *AEP*. *See* 131 S. Ct. at 2535 n.6.

5      Regardless, the case for dismissal on prudential standing grounds is even stronger here than it was

6  in *AEP*. In *AEP*, the plaintiffs sought judicial imposition of a cap on greenhouse gas emissions for a small

7  number of power companies and the federal Tennessee Valley Authority. Here, Plaintiffs (Cmplt. pp. 39-

8  40) request – among many other things – an unprecedented mandatory injunction ordering federal agencies

9  to take action "consistent with" the federal government's "equitable share of the global effort," "to reduce

10 global emissions, and thereby enable *global* $CO_2$ emissions to peak by December 2012" and "decline" by at

11 least 6% per year thereafter (emphasis added). Such an undertaking would necessarily entail multifarious

12 policy judgments, which should be made by decisionmakers who are politically accountable, have

13 expertise, and are able to pursue a coherent national or international strategy.

14     As the Supreme Court made clear in *AEP*, courts are ill-suited to balance the various interests of,

15 and the burdens to be borne by, the many entities, groups, and sectors of the economy that, although not

16 parties to this litigation, are affected by a phenomenon that spans the globe. Describing EPA as the expert

17 agency that Congress designated to serve as the "primary regulator" of greenhouse gas emissions, the Court

18 explained that EPA is "surely better equipped to do the job than individual district judges issuing ad hoc,

19 case-by-case injunctions."

20     Federal judges lack the scientific, economic, and technological resources  an agency can
       utilize in coping with issues of this order.  Judges may not commission scientific studies or
21     convene groups of experts for advice, or issue rules under notice-and-comment procedures
       inviting input by any interested person, or seek the counsel of regulators in the States where
22     the defendants are located.

23 *Id.* at 2539-40 (citation omitted). Unlike federal agencies, "judges are confined by a record comprising the

24 evidence the parties present." *Id.* at 2540.[4/] The Supreme Court also explained that climate change issues,

25

26 _____

27 [4] Plaintiffs here envision that the Court's decision would not be based on an administrative record or
   conducted under the APA. Rather, to issue its rulings, the Court would hold a trial and hear evidence
28 presented by the parties – a small group of plaintiffs and a select set of federal agencies. The greater public
                                                                                      (continued...)

in particular, are infused with complex policy concerns:

> The appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum: as with other questions of national or international policy, informed assessment of competing interests is required.  Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance.

*Id.* at 2539.  The Court flatly rejected those plaintiffs' proposals that individual federal judges determine "in the first instance" – in suits that could be brought in any federal district court against potentially thousands of defendant $CO_2$ emissions contributors – what emissions are "unreasonable" and what reductions are "practical, feasible and economically viable." *Id.* at 2539-40.

### B.   Plaintiffs Also Lack Article III Standing Because Their Claim Is Not Redressable

As discussed in the United States' opening memorandum, *Lujan v. Defenders of Wildlife* articulates the test for standing – a plaintiff must demonstrate that it has suffered a concrete and particularized injury that is not just caused by and fairly traceable to the act challenged in the litigation, but is also *redressable* by the court.  504 U.S. 555, 560-61 (1992).  The types of redress that Plaintiffs seek – restoration of global atmospheric $CO_2$ levels to less than 350 ppm this century, cessation of deforestation and deglaciation, an end to global warming, improvement of agricultural lands, and so forth almost without limit – lie far outside the Judicial Branch's competence and jurisdiction.  In that regard, one of the "experts" tendered by Plaintiffs, Paul R. Epstein (Doc. 25), published an article last year – *Bringing Climate Change into Global Governance* (2010) – articulating his view that "little will happen in the climate realm until the *international financial architecture* is revamped to drive positive climate change responses, including increased energy efficiency and robust energy programs." http://www.thesolutionsjournal.com/node/579, at 1. (Emphasis added).  Presumably even Plaintiffs would concede that such an endeavor lies outside this Court's authority and expertise.

Plaintiffs, of course, cite no statute that authorizes federal courts at the behest of allegedly injured parties to enjoin "unreasonable" greenhouse gas emissions.  Nor do they rely on a statutory framework specifying who may bring suit or the agency duties that are supposedly being violated, such that a court

---

(...continued)
and even Congress would play no role in the process.  Given the aggressive timelines advocated by Plaintiffs in their preliminary injunction motion and Complaint, this would all need to occur in short order.

1  could provide redress by requiring compliance with those specific duties.  In short, Plaintiffs offer no

2  foundation whatsoever for their contention that this Court should assume the mantle of "super-enforcer"

3  and singlehandedly fix the world's climate change problem.

4      Although Plaintiffs' one-page rejoinder on this issue ignores most of the redressability arguments

5  made in the United States' memorandum, Plaintiffs cite *Massachusetts v. EPA*, 549 U.S. 497 (2007), for the

6  proposition that Article III standing is not defeated merely because a favorable decision will not relieve a

7  plaintiff's "every injury." (Pl. Opp. 17).  But Plaintiffs miss the point.  The *Massachusetts* Court found

8  significant that in the Clean Air Act, Congress had authorized judicial review of the EPA actions in

9  question. 549 U.S. at 516.  Here, in contrast, Plaintiffs' unprecedented cause of action is unmoored from

10  any statute or regulation and falls squarely within a class of cases that the Supreme Court has advised must

11  not be entertained: those seeking to "vindicate the public's non-concrete interest in the proper

12  administration of the laws." *Id.* at 516-17.  Because Plaintiffs cannot establish that their alleged injuries are

13  redressable in this proceeding, they lack Article III standing to press their public trust doctrine claim.

14  **IV.   THE PUBLIC TRUST DOCTRINE DOES NOT SUPPLY A FEDERAL CAUSE OF ACTION AGAINST THE UNITED STATES AND, IN ANY EVENT, PLAINTIFFS' CLAIM**

15  **DOES NOT FALL WITHIN THE BOUNDARIES OF THE DOCTRINE**

16      In contending that the public trust doctrine provides a federal cause of action, Plaintiffs open their

17  discussion not with citation to federal case law or statutes but with a summary of various law review

18  articles they claim favor their position.  (Pl. Opp. 2-3).  But law review articles are not precedent and cannot

19  be relied on to support Plaintiffs' attempt to fabricate a federal cause of action where none previously

20  exists.[5]/

21      The public trust doctrine functions in some states as a constraint on a *state's* ability to alienate

22  public trust lands and as a limitation on uses that interfere with trust purposes. *See Dist. of Columbia v. Air*

23  *Fla., Inc.*, 750 F.2d 1077, 1082-83 (D.C. Cir. 1984).  Hence, Plaintiffs are forced to ground their arguments

24

25
_____

26  [5] When similarly faced with "myriad law review articles" proffered in lieu of case law precedent, one court recently stated: "On the authoritative effect of scholarly discourse: 'easy access to publication helps law

27  professors remain productive "regardless of whether their work is relevant or even particularly good."' *In*

28  *re Delta Smelt Consolidated Cases*, 663 F. Supp. 2d 922, 945 n.8 (E.D. Cal. 2009)  (internal citation omitted).

*Def. Reply in Support of Motion to Dismiss: Case No. C11-2203 EMC*                                          -12-

1   on state court decisions (supplemented by law review articles). *See, e.g.*, Pl. Opp. 6 (citing Wisconsin

2   case); *id.* 8-9 (Hawaii and California cases); *id.* 11 (Arizona case).[6]/ But unlike states, the federal

3   government is a government of limited and defined powers, whose authority is ultimately both created and

4   constrained by the Constitution, and there is no Constitutional foundation for imputing a constraint of this

5   nature on the legislative authority conveyed under Article I, or on the plenary legislative authority over

6   public property that Congress is given under the Property Clause.  Moreover, federal agencies are creatures

7   of statute, and their powers and duties are defined by Congress, not by vague notions of the common law.

8         The Supreme Court's decision in *Ill. Cent. R.R. Co. v. Illinois*, 146 U.S. 387 (1892), does not help

9   Plaintiffs.  There, the Supreme Court invalidated the transfer of 1000 acres of submerged lands in Lake

10  Michigan to the Illinois Central Railroad, explaining that dominion and sovereignty over submerged lands

11  belong to the *state* in which the land is found.  *Id.* at 435.  The Court noted that title to such submerged

12  lands is "different in character from that which the state holds in lands intended for sale" because it is "held

13  in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over

14  them, and have liberty of fishing therein, freed from the obstruction or interference of private parties." *Id.*

15  at 452.  Illinois, the Court held, "can no more abdicate its trust over property in which the whole people are

16  interested, like navigable waters and the soils under them, so as to leave them entirely under the use and

17  control of private parties . . . than it can abdicate its police powers in the administration of government and

18  the preservation of peace." *Id.* at 453.  And when several years before issuing that decision the Supreme

19  Court stated that "all of the public lands of the nation are held in trust for the people of the whole country,"

20  *United States v. Trinidad Coal Co.*, 137 U.S. 160 (1890), it did so to justify the invalidation of wrongfully

21  issued patents to coals lands, not to impose a trustee duty on government to safeguard public trust values.

22  And when it quoted that statement two decades later, it did so to hold that Congress was the one to

23

24  _____

25  [6] Plaintiffs also rely (Pl. Opp. 6) on an educational website operated by the National Oceanic and
    Atmospheric Administration ("NOAA"), but NOAA's statements there carry no weight as legal authority
    and in any event do not support Plaintiffs' notion that Plaintiffs have a valid federal cause of action.

26  NOAA's website states: "The Public Trust Doctrine is a common-law doctrine of property law, customized
    by *each state*, which establishes public rights in navigable waters and on their shores."

27  http://www.csc.noaa.gov/ptd/module01/lesson01/0101a.htm. (Emphasis added).

28

1  determine whether to reserve lands, that there was no duty to divest lands to the state or their people, and

2  that a cattleman had no right to let his cattle stray onto forest reserves. *Light v. United States*, 220 U.S. 523

3  (1911). Indeed, in *Kleppe v. New Mexico*, 426 U.S. 529 (1976), the Court characterized the power of

4  Congress over public lands as "plenary."[2]/

5      But even assuming for argument's sake that the public trust doctrine could support a valid claim

6  under federal common law – an issue this Court need not reach – the doctrine has never been held to furnish

7  a federal cause of action such as that advanced here by Plaintiffs, which would make select federal agencies

8  "trustees" of the global atmosphere, whose actions (or failures to act) are subject to unfettered review by a

9  federal court. Their claim falls well outside any conceivable application of the public trust doctrine. And,

10 as *AEP* makes clear, federal courts must "remain[] mindful" that they do "not have creative power akin to

11 that vested in Congress." 131 S. Ct. 2536.

**V.    EVEN IF PLAINTIFFS COULD STATE A FEDERAL PUBLIC TRUST CLAIM, SUCH A
12      CLAIM IS FORECLOSED BY THE CLEAN AIR ACT AND OTHER FEDERAL
13      ENVIRONMENTAL AND RESOURCE STATUTES AND INITIATIVES**

14     The Supreme Court made clear in *AEP* that the CAA displaces federal common law causes of action

15 against EPA seeking reduction of greenhouse gases from sources covered by the CAA. Although Plaintiffs

16 want this Court to fashion remedies for emissions of greenhouse gases in the first instance, Congress gave

17 that authority to EPA instead. A federal court may not second-guess that legislative choice under the guise

18 of federal common law.

19     Plaintiffs do not attack just EPA's administration of its duties. They assert broad challenges to five

20 other agencies' execution of their statutory duties. But the public trust doctrine – to the extent it ever

21 applied to the United States – has been effectively displaced by modern administrative law because

22

23 [2] *Matter of Steuart Transp. Co.*, 495 F. Supp. 38, 40 (E.D. Va. 1980) (cited Pl. Opp. 5), is not to the
24 contrary. That court held that the federal government was authorized to recover against Steuart for damage
   to migratory waterfowl following an oil spill, rejecting Steuart's contention that the government lacked
25 such authority because it did not have an "ownership" interest in the waterfowl. Nor are *United States v.
   1.58 Acres of Land*, 523 F. Supp. 120 (D. Mass. 1981), and *City of Alameda v. Todd Shipyards Corp.*, 635
26 F. Supp. 1447 (N.D. Cal. 1986), relevant here. Both concerned the scope of restrictions applicable to
   tidelands when the United States acquired the land. None of these cases supports the notion that federal
27 land managers are subject to fiduciary standards of stewardship beyond explicit statutory duties, or the
28 notion that the federal government is subject to suit for alleged violations of a "duty" to protect the
   atmosphere.

1   Congress has, in a host of statutes, created a wide array of federal agencies and assigned them land use and

2   other resource obligations so as to effectively exclude room for the public trust doctrine, as Plaintiffs

3   conceive it, to operate.

4          In their response on this issue, Plaintiffs resort, yet again, to their circular contention that "federal

5   courts necessarily have jurisdiction to hear federal public trust cases because it is a judicially created and

6   enforced doctrine." (Pl. Opp. 17). Elaborating further, they explain that this is so because the public trust

7   doctrine "overlays all other acts of government, including the enactment of legislation or the promulgation

8   of regulations." (*Id.* 18). Plaintiffs go on to advance the proposition that all government laws and actions

9   "are always judicially reviewable under the Public Trust Doctrine, to ensure that the trust resource is

10  protected for future generations." (*Id.* 18). Finally, they assert that even when the government "legislates

11  or regulates to prevent harm to the trust," "the basic trust question remains as to whether such regulation is

12  adequate to protect the trust asset for present and future generations." (*Id.* 20). In sum, "public trust claims

13  are not subject to displacement." (*Id.* 17). Of course, Plaintiffs offer no applicable precedent for these

14  astonishing propositions, which if accepted would make public trust cases uniquely immune from any and

15  all limitations on federal court jurisdiction.

16                                     **CONCLUSION**

17         Plaintiffs' Complaint should be dismissed.

18  Respectfully submitted, November 21, 2011          IGNACIA S. MORENO,
                                                        Assistant Attorney General
19                                                      Environment and Natural Resources Division

20                                                      */s/ Martin F. McDermott*
                                                        MARTIN F. McDERMOTT, Attorney
21                                                      United States Department of Justice

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2   I hereby certify that on the 21st day of November, 2011, a copy of the foregoing REPLY MEMORANDUM
    IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS was filed and served through the
3   Court's CM/ECF system.

4   s/ *Martin F. McDermott*
    Trial Attorney, U.S. Department of Justice
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28