1  Jennifer J. Middleton (Ca. Bar No. 178546)
   **JOHNSON, JOHNSON, LARSON & SCHALLER, PC**
2  975 Oak Street, Suite 1050
   Eugene, OR  97401
3  Phone:      541-484-2434
   Facsimile:    541-484-0882
4  jmiddleton@jjlslaw.com

5  *Counsel for Amicus Curiae Law Professors*

6

7

8                **UNITED STATES DISTRICT COURT**
          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
9                   **SAN FRANCISCO DIVISION**

10  **ALEC L.,** *et al.*,
                                          No. 3:11-cv-02203 EMC
11                            Plaintiffs,

12          v.                            **BRIEF FOR AMICUS CURIAE
                                          LAW PROFESSORS – EXHIBIT A**
13  **LISA JACKSON, et al.**,
                                          **(Hon. Edward Chen)**
14                            Defendants.

15

16

17

18

19

20

21

22

23

24

25

26

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR  97401
TELEPHONE (541) 484-
2434

1

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................2

TABLE OF AUTHORITIES ...........................................................................3

IDENTITY OF INTERESTS OF THE AMICI CURIAE ..............................6

SUMMARY OF THE ARGUMENT ..............................................................6

ARGUMENT .................................................................................................6

I. INTRODUCTION.......................................................................................6

II. THE PUBLIC TRUST DOCTRINE AS AN ATTRIBUTE OF SOVEREIGNTY....8

III.  THE AIR AND ATMOSPHERE AS PUBLIC TRUST ASSETS ........................13

IV.  THE FEDERAL TRUST RESPONSIBILITY ..........................................18

CONCLUSION.............................................................................................21

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
TELEPHONE (541) 484-2434

1

# TABLE OF AUTHORITIES

2

Cases

3
*Arnold v. Mundy*, 6 N.J.L. 1 (N.J. 1821) ................................................................. 10

4
*Alabama v. Texas, 374 U.S. 272 (1954)* ................................................................. 20

5
*Ariz. Ctr. for Law in Pub. Interest v. Hassell*, 837 P.2d 158 (Az. Ct. App. 1991).............................. 8

6
*City of Milwaukee v. State*, 214 N.W. 820 (Wis. 1927) ................................................. 13

7
*City of New Orleans v. Bd. of Comm'rs of Orleans Levee Dist.*, 640 So.2d 237 (La. 1994) ............ 11

8
*Ctr. for Biological Diversity v. FPL Grp.*, 166 Cal.App.4th 1349 (Cal. App. 1 Dist. 2008) ............. 9

9
*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 508 F.3d 508 (9th Cir. 2007).. 7

10
*Division of State Lands v. United States*, 482 U.S. 193 ............................................... 19

11
*Geer v. Connecticut*, 161 U.S. 519 (1896) .......................................................... 9, 10, 12, 16

12
*Georgia v. Tennessee, 206 U.S. 230 (1907)* ........................................................... 16

13
*Her Majesty v. City of Detroit*, 874 F.2d 332 (6th Cir. 1989) ........................................ 17

14
*Illinois Central Railroad Co. v. Illinois*, 146 U.S. 387 (1892).................................... passim

15
*In re Complaint of Steuart Transportation Co.*, 495 F. Supp. 38 (E.D. Va. 1980)..................... 21

16
17
*In re Water Use Permit Applications, Waihole Ditch Combined Contested Case Hearing*, 94 Haw. 97, 9 P.3d 409 (Haw. 2000)........................................................... 8, 9, 10

18
*Just v. Marinette Cnty.*, 201 N.W.2d 761 (Wis. 1972)............................................... 13, 15

19
*Magner v. People*, 97 Ill. 320 (Ill. 1881)) ......................................................... 9, 12

20
*Marks v. Whitney*, 491 P.2d 374 (Cal. 1971)......................................................... 15

21
*Massachusetts v. EPA*, 549 U.S. 497 (2007)........................................................... 7

22
*Matthews v. Bay Head Improvement Ass'n*, 471 A.2d 355 (N.J. 1984)................................... 15

23
*Nat'l Audubon Soc'y v. Superior Court of Alpine Cnty.*, 658 P.2d 709 (Cal. 1983)............. 12, 15, 17

24
*New York v. DeLyser*, 759 F. Supp. 982 (W.D.N.Y. 1991).............................................. 21

25
*Owsichek v. State Guide Licensing and Control Bd.*, 763 P.2d 488 (Alaska, 1988)..................... 15

26
*Robinson v. Ariyoshi*, 658 P.2d 287 (Haw. 1982) .................................................... 15
*State v. City of Bowling Green*, 313 N.E. 2d 409 (Ohio 1974) ........................................ 12

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
TELEPHONE (541) 484-2434

PAGE 3 OF 23 –BRIEF FOR AMICUS CURIAE LAW PROFESSORS – EXHIBIT A
CASE NO.: 3:11-CV-02203 EMC

*State ex. Rel. City of Minot v. Gronna*, 59 N.W. 2d 514 (N.D. 1953)................................. 11

*State ex. Rel. Town of Westerly v. Bradley*, 877 A.2d 601 (R.I. 2005) ............................. 17

*The Genessee Chief v. Fitzhugh*, 53 U.S. 443 (1851)..................................................... 14

*United States v. 1.58 Acres of Land*, 523 F. Supp. 120 (D. Mass. 1981).............................. 10, 11, 19

*United States v. Causby,* 328 U.S. 256 (1946) ................................................................ 17, 20

*Utah Division of State Lands,* 482 U.S. 193 (1987) ........................................................ 19

Constitutions & Statutes

16 U.S.C.A. § 1375 (2004)...................................................................................21

33 U.S.C.A. § 1319 (2004)................................................................................... 21

33 U.S.C. § 2706(a) (2004) .................................................................................. 21

42 U.S.C. § 4331(b)(1) ........................................................................................ 21

42 U.S.C. § 9601 (2006) ...................................................................................... 17

49 U.S.C.A. § 176(a) ........................................................................................... 16

42 U.S.C. § 9607(f)(1) (2004) .............................................................................. 21

Haw. Const. art. XI § 1 ........................................................................................ 17

R.I. Const., art. I, § 17 ......................................................................................... 17

Other Authorities

Michael C. Blumm & Rachel D. Guthrie, *Internationalization of the Public Trust Doctrine: Natural Law and Constitutional and Statutory Approaches to Fulfilling the Saxion Vision, 44 U.C. Davis Law Review*____ (forthcoming, 2012) ........................................................................ 10

Michael C. *Blumm, The Public Trust Doctrine – A Twenty-First Century Concept*, 16 HASTINGS WEST-NORTHWEST 105 (2010) .........................................................................14

George G. Bogert, et al., BOGERT'S TRUSTS AND TRUSTEES, § 582 (2011) ..................................... 13

Seth Borenstein, *Biggest Jump Ever Seen in Global Warming Gases*, ASSOCIATED PRESS, Nov. 4, 2011 ...................................................................................................... 7

Karl S. Coplan, *Public Trust Limits on Greenhouse Gas Trading Schemes: A Sustainable Middle Ground?* 35 COLUM. J. ENVTL. L. 287, 311 (2010) ...................................................... 10

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
ELEPHONE (541) 484-
2434

Robin Kundis Craig, *Adapting to Climate Change: The Potential Role of State Common-Law Public Trust Doctrines*, 34 VT. L. REV. 781 (2010) .................................................................... 16

Douglas L. Grant, *Underpinnings of the Public Trust Doctrine: Lessons from Illinois Central Railroad,* 48 ARIZ. ST. L.J. 849 (2001) ................................................................12

Patrick Parenteau, *Come Hell And High Water: Coping with the Unavoidable Consequences of Climate Disruption*, 34 VT. L. REV. 957 (2010) ........................................................................... 16

Zygmunt J.B. Plater *et al.*, ENVIRONMENTAL LAW AND POLICY: NATURE, LAW, AND SOCIETY 1103 (Erwin Chemerinsky *et. al.,* eds., 3rd ed. 2004) .........................................................19

Elizabeth Rosenthal, *U.N. Chief Seeks More Climate Change Leadership*, N.Y. TIMES.COM (Nov. 18, 2007) ........................................................................................................................................ 8

Joseph L. Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention,* 68 MICH. L. REV. 471 (1970) ............................................................................................... 8, 9, 16

David Takacs, *The Public Trust Doctrine, Environmental Human Rights, and the Future of Private Property,* 16 N.Y.U. ENVTL. L. J. 711, 746 (2008) ........................................................ 11

Gerald Torres, *Who Owns the Sky?*, 19 PACE ENVTL. L. REV. 515 (2002) .................................. 15, 17

Mary Turnipseed, Raphael Sagarin, Peter Barnes, Michael C. Blumm, Patrick Parenteau, & Peter H. Sand, *Reinvigorating the Public Trust Doctrine: Expert Opinion on the Potential of a Public Trust Mandate in U.S. and International Environmental Law,* ENV'T, Sept./Oct. 2010 ........................................................................................…... 10, 18

United Nations Framework Convention on Climate Change, S. Treaty Doc. No. 102–38, art. 3, p. 1 (1992) ............................................................................................................................................. 20

Charles F. Wilkinson, *The Public Trust Doctrine in Public Land Law*, 14 U.C. Davis L. Rev. 269 (1980) ............................................................................................................................................ 14

Charles Wilkinson, *The Headwaters of the Public Trust: Some of the Traditional Doctrine,* 19 ENVTL. L. 425 (1989) .................................................................................................................14

Mary Christina Wood, *Advancing the Sovereign Trust of Government to Safeguard the Environment for Present and Future Generations (Part I): Ecological Realism and the Need for a Paradigm Shift*, 39 ENVTL. L. 43 (2009) .................................................................................................10, 16

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
TELEPHONE (541) 484-
2434

PAGE 5 OF 23 –BRIEF FOR AMICUS CURIAE LAW PROFESSORS – EXHIBIT A
CASE NO.: 3:11-CV-02203 EMC

## IDENTITY AND INTERESTS OF THE AMICI CURIAE

Amicus curiae are law professors and scholars (listed on the signature page) who teach, research and write about environmental law, climate law, and the public trust doctrine, including two who teach courses devoted solely to the public trust. Amici have an interest in informing the Court about the role of the public trust doctrine in defining federal legal obligations to protect the atmosphere from greenhouse gas pollution. Amici file this brief solely as individuals and not on behalf of the institutions with which they are affiliated.

## SUMMARY OF THE ARGUMENT

The public trust doctrine is an inalienable attribute of sovereignty that requires government to act to prevent irrevocable harm to crucial natural resources owned in trust on behalf of the people. The federal government is a sovereign co-trustee of the nation's atmosphere and bears the fiduciary obligation to take expedient action to protect the atmosphere from dangerous greenhouse gas pollution so that it will continue to support the survival and welfare of present and future generations of citizens. A court's role under the public trust doctrine is to require agencies to protect the trust asset over which they exercise management authority. In this case, the scientific prescription for greenhouse gas reduction necessary to preserve a habitable planet is set forth in the Declaration of Pushker Kharecha in support of Plaintiff's motion for preliminary injunction.

## ARGUMENT

### I.    INTRODUCTION

Amicus law professors submit this brief to explain the fiduciary obligations of the federal government under the public trust doctrine as they pertain to greenhouse gas pollution threatening the planet's climate system. The public trust is one of the oldest principles known to civilized government. It requires protection of vital natural assets that belong in common to present and

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
ELEPHONE (541) 484-
2434

PAGE 6 OF 23 –BRIEF FOR AMICUS CURIAE LAW PROFESSORS – EXHIBIT A
CASE NO.: 3:11-CV-02203 EMC

future generations of citizens.  In this brief, amicus law professors offer a framework explanation of

the public trust as a fundamental attribute of sovereignty embedded in the Constitution itself,

applicable to both the federal and state governments.  As formulated by the U.S. Supreme Court in

one of the early landmark cases, the trust applies to protect resources of "special character" and

"public concern" in which the citizens have a crucial interest.  *Illinois Central Railroad Co. v.*

*Illinois*, 146 U.S. 387, 454-55 (1892).  The central rationale and purpose of the public trust doctrine

could hardly find a more compelling application than to the air and atmosphere which support the

planetary climate system upon which all life on Earth depends.

Judicial enforcement of fiduciary obligations is necessary when the political branches

abdicate their responsibility to protect the *res* of the trust.  The Obama administration has yet to

issue any encompassing rule regulating greenhouse gas emissions under clear authority provided in

the Clean Air Act.  *See Massachusetts v. EPA*, 549 U.S. 497 (2007).  In face of this inaction, carbon

dioxide emissions are climbing dangerously, last year by an unprecedented six percent.[1]  Continued

emissions threaten to push the planet past a "tipping point" in which dangerous feedback loops will

unravel the planet's climate system despite any subsequent carbon reductions achieved by

humanity.  As the court said in *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,

508 F.3d 508, 523 (9th Cir. 2007), "Several studies also show that climate change may be non-

linear, meaning that there are positive feedback mechanisms that may push global warming past a

dangerous threshold (the 'tipping point')."  Respected authorities emphasize the immediacy of this

crisis.  In 2007, the head of the United Nation's Intergovernmental Panel on Climate Change

(IPCC) unequivocally told the world: "What we do in the next two to three years will determine our

---

[1] Seth Borenstein, *Biggest Jump Ever Seen in Global Warming Gases*, ASSOCIATED PRESS, Nov. 4, 2011, *available at* http://news.yahoo.com/biggest-jump-ever-seen-global-warming-gases-183955211.html.

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
TELEPHONE: (541) 484-
2434

PAGE 7 OF 23 –BRIEF FOR AMICUS CURIAE LAW PROFESSORS – EXHIBIT A
CASE NO.: 3:11-CV-02203 EMC

1    future. This is the defining moment."[2]

2        The role of judicial enforcement is a crucial element of any trust. As the Hawaiian Supreme

3    Court emphasized in a leading public trust case involving water resources: "The check and balance

4    of judicial review provides a level of protection against improvident disposition of an irreplaceable

5    res." *In re Water Use Permit Applications, Waihole Ditch Combined Contested Case Hearing*

6    [hereinafter *Waihole Ditch*], 94 Haw. 97, 120, 9 P.3d 409, 455 (Haw. 2000). *See also Ariz. Ctr. for*

7    *Law in Pub. Interest v. Hassell*, 837 P.2d 158, 169 (Az. Ct. App. 1991), *petition dismissed* 1992

8    Ariz. LEXIS 82 (Ariz. 1992) ("Just as private trustees are judicially accountable to their

9    beneficiaries for dispositions of the res, so the legislative and executive branches are judicially

10   accountable for their dispositions of the public trust.") (citation omitted).  Though the modern

11   climate crisis would have been unimaginable when the U.S. Supreme Court first articulated the

12   public trust as a sovereign obligation, its rationale and purpose speaks as clearly now as back then.

13   The courts are called forth in much the same manner as they always have been in public trust cases

14   − not to exercise direct management over the *res* of the trust, but to ensure that the political

15   branches fulfill their trust obligation to avoid irreparable harm to an asset that must sustain

16   generations of citizens to come.

**II.      THE PUBLIC TRUST DOCTRINE AS AN ATTRIBUTE OF SOVEREIGNTY**

        The public trust doctrine holds that certain crucial natural resources are the shared, common

property of all citizens, cannot be subject to private ownership, and must be preserved and protected

by the government.  *See* Joseph L. Sax, *The Public Trust Doctrine in Natural Resource Law:*

*Effective Judicial Intervention*, 68 MICH. L. REV. 471 (1970).  As sovereign trustee of such

---

[2] Elizabeth Rosenthal, *U.N. Chief Seeks More Climate Change Leadership*, N.Y. TIMES.COM (Nov. 18, 2007), *available at* http://www.nytimes.com/2007/11/18/science/earth/18climatenew.html?scp=1&sq=UN%20Panel%

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
TELEPHONE (541) 484-
2434

PAGE 8 OF 23 –BRIEF FOR AMICUS CURIAE LAW PROFESSORS – EXHIBIT A
CASE NO.: 3:11-CV-02203 EMC

resources, government has a fiduciary obligation to protect these natural assets for the beneficiaries of the trust, which include both present and future generations of citizens. *See Illinois Central*, 146 U.S. at 455 ("The ownership of the navigable waters of the harbor, and of the lands under them, is a subject of public concern to the whole people of the state. . .The trust with which they are held, therefore, is governmental, and cannot be alienated . . ."); *Geer v. Connecticut*, 161 U.S. 519, 533–34 (1896) ("[t]he ownership of the sovereign authority is in trust for all the people of the state; and hence, by implication, it is the duty of the legislature to enact such laws as will best preserve the subject of the trust, and secure its beneficial use in the future to the people of the state.") *quoting Magner v. People*, 97 Ill. 320, 334 (Ill. 1881)); *Waihole Ditch*, 94 Haw. at 120, 9 P.3d at 455 ("The beneficiaries of the public trust are not just present generations but those to come."). The legislature is the primary trustee, and the executive branch, as an agent of the trustee, is vested with the same public trust obligation. *See Ctr. for Biological Diversity v. FPL Grp.*, 166 Cal.App.4th 1349, 1365-66 (Cal. App. 1 Dist. 2008) (discussing public trust obligations of "public agencies"); *Waihole Ditch*, 94 Haw. 97, 9 P.3d 409 (applying public trust obligations to state agency).

The public trust doctrine speaks to one of the most essential purposes of government: protecting natural resource assets for the common benefit of the citizenry. As Professor Joseph Sax suggested over four decades ago, the public trust responsibility underpins democracy itself, demarcating a society of "citizens rather than of serfs." *See* Sax, *supra, at* 484. The courts of the United States have traced the origins of the public trust back through the English legal system to Roman law and to natural law, identifying it as one of the pillars of ordered civilization. *Geer*, 161 U.S. at 526 (the sovereign trust over wildlife resources is manifest "through all vicissitudes of governmental authority"); *Illinois Central*, 146 U.S. at 456 (declaring that a state legislature

20avert%20climate%20disaster&st=cse (statement of Rajendra Pachauri).

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
ELEPHONE: (541) 484-
2434

"cannot, consistently with the principles of the law of nature and the constitution of a well-ordered society, make a direct and absolute grant of the waters of the state, divesting all the citizens of their common right. It would be a grievance which never could be long borne by a free people.") *citing Arnold v. Mundy*, 6 N.J.L. 1, 78 (N.J. 1821); *United States v. 1.58 Acres of Land*, 523 F. Supp. 120, 122–23 (D. Mass. 1981) (finding trust over submerged lands evident in all forms of government in developed western civilization).   Not surprisingly, the public trust is also a central principle in legal systems of many other countries throughout the world.   Professor Michael Blumm concludes that the doctrine is "close to becoming considered customary law" on an international scale.[3]

The public trust doctrine is as an attribute of sovereignty itself. *See, e.g., Geer*, 161 U.S. at 527 (describing the sovereign trust over wildlife resources as an "attribute of government"); *Illinois Central*, 146 U.S. at 455; *Arnold*, 6 N.J.L. at 76-77;  *Waihole Ditch*, 94 Haw. at 131, 9 P.3d at 443 ("[H]istory and precedent have established the public trust as an inherent attribute of sovereign authority. . . ."). *See also* Karl S. Coplan, *Public Trust Limits on Greenhouse Gas Trading Schemes: A Sustainable Middle Ground?* 35 COLUM. J. ENVTL. L. 287, 311 (2010) [hereinafter *Public Trust Limits*] ("[t]he idea that public trust limits and powers inhere in the very nature of sovereignty is one consistent thread in public trust cases."); Mary Christina Wood, *Advancing the Sovereign Trust of Government to Safeguard the Environment for Present and Future Generations (Part I): Ecological Realism and the Need for a Paradigm Shift*, 39 ENVTL. L. 43, 69 (2009) (describing trust as "fundamental, organic attribute of sovereignty itself.").   As a limitation on

---

[3]   Michael C. Blumm & Rachel D. Guthrie, *Internationalization of the Public Trust Doctrine: Natural Law and Constitutional and Statutory Approaches to Fulfilling the Saxion Vision*, 44 U.C. DAVIS  L.  REV. ___ (forthcoming,  2012)  (manuscript  at  8,  available  at http://ssrn.com/abstract=1816628). *See also* Mary Turnipseed, Raphael Sagarin, Peter Barnes, Michael C. Blumm, Patrick Parenteau, & Peter H. Sand, *Reinvigorating the Public Trust Doctrine: Expert Opinion on the Potential of a Public Trust Mandate in U.S. and International Environmental Law*, ENV'T, Sept./Oct. 2010, at 12 (functional equivalents of public trusteeship are evident in many

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
ELEPHONE (541) 484-
2434

sovereignty, the trust "can only be destroyed by the destruction of the sovereign." *1.58 Acres of Land*, 523 F. Supp. at 124. In its seminal public trust case, *Illinois Central*, the Supreme Court emphasized that, like the police power, the public trust doctrine is a foundational principle of government. It declared that legislatures may not repudiate, abridge, or surrender their trust obligation: "The state can no more abdicate its trust over property in which the whole people are interested . . . than it can abdicate its police powers in the administration of government and the preservation of the peace. . . . Every legislature must, at the time of its existence, exercise the power of the state in the execution of the trust devolved upon it." 146 U.S. at 454, 460. Thus the Court recognized that the trust doctrine imposed governmental duties as well as governmental authority.

The public trust doctrine assumes Constitutional force as an inherent attribute of sovereignty. By analogy, courts have made clear that the police power is an essential Constitutional element, whether explicitly expressed or not. *State ex. rel. City of Minot v. Gronna*, 59 N.W.2d 514, 531–32 (N.D. 1953) ("The police power is an attribute of sovereignty inherent in the states of the American union, and exists without any reservation in the constitution, being founded on the duty of the state to protect its citizens and provide for the safety and good order of society. The constitution supposes the pre-existence of the police power, and must be construed with reference to that fact.") (citation omitted)(internal quotations omitted); *see also City of New Orleans v. Bd. of Comm'rs of Orleans Levee Dist.*, 640 So.2d 237, 249 (La. 1994) ("The principle of constitutional law that a state cannot surrender, abdicate, or abridge its police power has been recognized without exception by the state and federal courts.").

Professor Grant has observed that the public trust, wholly distinct from the police power, represents an iteration of the Constitutional reserved powers doctrine, which prevents any one

civil law systems); David Takacs, *The Public Trust Doctrine, Environmental Human Rights, and*

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
TELEPHONE (541) 484-2434

legislature from taking acts that would compromise a future legislature's ability to exercise sovereignty on behalf of the people. *See generally* Douglas L. Grant, *Underpinnings of the Public Trust Doctrine: Lessons from Illinois Central Railroad,* 48 ARIZ. ST. L.J. 849 (2001). Allowing damage to, or privatization of, crucial trust resources needed for public welfare impairs the ability of future legislatures in violation of the reserved powers doctrine. The Supreme Court made this clear when it held that the Illinois legislature could not convey title to the harbor of Lake Michigan to a private railroad corporation: "The legislature could not give away nor sell the discretion of its successors in respect to matters, the government of which, from the very nature of things, must vary with varying circumstances. The legislation which may be needed one day for the harbor may be different from the legislation that may be required at another day. Every legislature must, at the time of its existence, exercise the power of the state in the execution of the trust devolved upon it." 146 U.S. at 454, 460. *Illinois Central,* 146 U.S. at 460. Failure to protect a functioning climate for future generations would obviously impair future legislatures in their exercise of sovereignty to provide for basic needs of the public.

The essence of the trust responsibility is the sovereign fiduciary duty to protect the public's crucial assets from irrevocable damage. *See Geer,* 161 U.S. at 534 ("[I]t is the duty of the legislature to enact such laws as will best preserve the subject of the trust, and secure its beneficial use in the future to the people of the state.") *quoting Magner,* 97 Ill. at 334; *see also State v. City of Bowling Green,* 313 N.E.2d 409, 411 (Ohio 1974) ("[W]here the state is deemed to be the trustee of property for the benefit of the public it has the obligation to bring suit . . . to protect the corpus of the trust property."); *Nat'l Audubon Soc'y v. Superior Court of Alpine Cnty.,* 658 P.2d 709, 724 (Cal. 1983) (expressing the "duty of the state to protect the people's common heritage of streams,

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
TELEPHONE (541) 484-
2434

*the Future of Private Property,* 16 N.Y.U. ENVTL. L. J. 711, 746 (2008).

1   lakes, marshlands and tidelands."). Under well-established core principles of trust law, trustees

2   have a basic duty not to sit idle and allow damage to the trust property. As one leading treatise

3   explains, "[t]he trustee has a duty to protect the trust property against damage or destruction."

4   George G. Bogert, et al., BOGERT'S TRUSTS AND TRUSTEES, § 582 (2011); *see also City of*

5   *Milwaukee v. State*, 214 N.W. 820, 830 (Wis. 1927) ("The trust reposed in the state is not a passive

6   trust; it is governmental, active, and administrative [and] requires the lawmaking body to act in all

7   cases where action is necessary, not only to preserve the trust, but to promote it. . . ."); *Just v.*

8   *Marinette County*, 201 N.W.2d 761, 768-70 (1972) (emphasizing "active public trust duty" on the

9   part of the state that requires the eradication of pollution and the preservation of the natural resource

10  held in trust). Notably, these obligatory fiduciary duties differ from the permissive nature of

11  administrative discretion under statutory law. By sitting idle in the face of calamitous planetary

12  ecological crisis, the federal government is abdicating its Constitutional responsibility as sovereign

13  trustee to protect the climate for today's citizens and for future generations.

14

15

16  **III.    THE AIR AND ATMOSPHERE AS PUBLIC TRUST ASSETS**

17          The history, principles, and intent of the public trust doctrine compel this Court's

18  recognition of the atmosphere as one of the crucial assets of the public trust. The public trust

19  doctrine requires the state to protect those ecological resources necessary for public survival and

20  welfare. Stemming from the "public character of the property," *Illinois Central*, 146 U.S. at 455-

21  56, these resources are owned in common by the people and must be maintained, protected, and

22  preserved by the state for the public interest. The resources that fall within the protective scope of

23  the public trust are traditionally those that "are so central to the well-being of the community that

24

25

26

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
TELEPHONE (541) 484-
2434

PAGE 13 OF 23 –BRIEF FOR AMICUS CURIAE LAW PROFESSORS – EXHIBIT A
CASE NO.: 3:11-CV-02203 EMC

they must be protected by distinctive, judge-made principles."[4]  Rather than restrictively delimiting the covered assets, courts have articulated principles that have guided the evolution of public trust property over time.

In *Illinois Central*, the Supreme Court established the analytical framework with its seminal characterization of public trust assets as those that present "a subject of concern to the whole people of the state." 146 U.S. at 455. Describing public trust assets as "public property, or property of a special character," the Court said they "cannot be placed entirely beyond the direction and control of the state" and, for the sake of public welfare, should not be subject to private ownership. *Id.* at 454. Courts look to the needs of the public in defining the scope of the trust resources.

In the late 1800s, at the time of *Illinois Central*, the natural resources deemed to be of greatest threat and in scarcest supply were principally water-based – ones implicating fishing, navigation, and commerce interests at the economic heart of a westward-expanding American economy.  The specter of corporate privatization of the Chicago harbor led Justice Field in *Illinois Central* to characterize submerged lands as "a subject of concern to the whole people" clothed with sovereign trust interests compelling protection. *Id.* at 455.

Consistent with *Illinois Central*, over time courts have expanded the reach of the public trust doctrine to protect other categories of public resources as their integrity has come under threat.[5]  In the 19th century, courts expanded public navigation rights from tidal waters to inland waters that were navigable-in-fact. *See The Genessee Chief v. Fitzhugh*, 53 U.S. 443, 457 (1851); *see also* Michael C. Blumm, *The Public Trust Doctrine – A Twenty-First Century Concept*, 16 HASTINGS WEST-NORTHWEST 105 (2010) *available at*

---

[4] Charles F. Wilkinson, *The Public Trust Doctrine in Public Land Law*, 14 U.C. Davis L. Rev. 269, 315 (1980).
[5] Charles Wilkinson, *The Headwaters of the Public Trust: Some of the Traditional Doctrine*, 19

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
ELEPHONE (541) 484-
2434

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1468601 (describing evolution of the trust). As the New Jersey Supreme Court noted, the doctrine of the public trust is not "'fixed or static,' but one to be 'molded and extended to meet changing conditions and needs of the public it was created to benefit.'" *Matthews v. Bay Head Improvement Ass'n*, 471 A.2d 355, 365 (N.J. 1984) (citation omitted); *see also Marks v. Whitney*, 491 P.2d 374, 380 (1971) ("In administering the trust the state is not burdened with an outmoded classification favoring one mode of utilization over another."). Courts have mobilized the doctrine to respond to new sets of societal concerns, including ecological and recreational interests. *See Nat'l Audubon Soc'y*, 658 P.2d at 724. In the process, they have recognized public trust assets beyond the navigable waterways at issue in *Illinois Central* to protect resources as diverse as non-navigable tributaries, groundwater, wetlands, dry sand areas, and wildlife.[6]

As scientific consensus and daily experience increasingly reflect, the atmosphere – and the air that composes it – is the critical natural resource under threat in our time that demands protection within the traditional framework of the public trust. Indeed, our rapidly heating atmosphere *is* the submerged lakebed of *Illinois Central* and much more. The critical difference, which makes recognition of the atmosphere all the more imperative, is that its degradation poses a catastrophic threat to human society of a magnitude unimaginable in the day when Justice Field invoked the doctrine. The shoreline of Lake Michigan pales in importance to the ambient atmosphere that sustains life itself across the planet.[7]

---

ENVTL. L. 425 (1989) (noting expansion of the public trust doctrine).
[6] *See, e.g., Nat'l Audubon Soc'y*, 658 P.2d at 719 (non-navigable tributaries); *Owsichek v. State Guide Licensing and Control Bd.*, 763 P.2d 488, 493 (Alaska, 1988)(wildlife); *Matthews*, 471 A.2d at 358 (dry sand area); *Robinson v. Ariyoshi*, 658 P.2d 287, 311 (Haw. 1982) (groundwater); *Just v. Marinette Cnty.*, 201 N.W.2d 761, 769 (Wis. 1972) (wetlands).
[7] Commentators increasingly point out the logic and necessity of a public trust approach to the climate crisis. *See, e.g.,* Gerald Torres, *Who Owns the Sky?*, 19 PACE ENVTL. L. REV. 515, 533

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
TELEPHONE (541) 484-
2434

PAGE 15 OF 23 –BRIEF FOR AMICUS CURIAE LAW PROFESSORS – EXHIBIT A
CASE NO.: 3:11-CV-02203 EMC

1   Despite the sheer novelty of climate change as an imminent threat to human survival -- and

2   ultimately, to civilization itself -- the notion of air as a public trust resource is as old as the ancient

3   foundations of our legal system. The Roman originators of the public trust doctrine classified air –

4   along with water, wildlife, and the sea – as "res communes," or "things which remain common."

5   *Geer*, 161 U.S. at 525 ("These things are those which the juris consults called 'res communes' – the

6   air, the water which runs in the rivers, the sea and its shores…[and] wild animals."). Roman law

7   recognized that "individual control of some resources would run counter to what [they] conceived

8   of as their natural purpose, and this property could not therefore be subject to public ownership."[8]

9   In *Geer*, the Court relied on this ancient Roman law classification of "res communes" to find the

10  public trust doctrine applicable to wildlife. 161 U.S. at 523-525. Just a few years later, the Court

11  similarly recognized the states' sovereign property interests in air and found such interests supreme

12  to private title. In *Georgia v. Tennessee*, the Court upheld an action by the State of Georgia against

13  Tennessee copper companies for transboundary air pollution, declaring that "the state has an

14  interest independent of and behind the titles of its citizens, in all the earth *and air* within its

15  domain." 206 U.S. 230, 237 (1907) (emphasis added).

16  The notion of the atmosphere as a quintessentially public resource subject to government

17  stewardship is a settled feature of American law. For example, Congress articulated the public

18  nature of the air resource in the Air Commerce Act of 1926, which recognized that the United

19  States "has complete and exclusive national sovereignty in [its] air space." 49 U.S.C.A. § 176(a).

---

(2002) ("Properly understood . . . the traditional rationale for the public trust doctrine provides a necessary legal cornerstone . . . to protect the public interest in the sky."); Joseph L. Sax, *supra,* at 556-57 (urging application of doctrine to "controversies involving air pollution"); Wood, *Advancing the Sovereign Trust of Government, supra,* at 80-81; Patrick Parenteau, *Come Hell And High Water: Coping with the Unavoidable Consequences of Climate Disruption*, 34 VT. L. REV. 957, 963-64 (2010); Robin Kundis Craig, *Adapting to Climate Change: The Potential Role of State Common-Law Public Trust Doctrines*, 34 VT. L. REV. 781 (2010).

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
ELEPHONE (541) 484-
2434

Like waterways, air lends itself to navigability, which presents a classic trust interest articulated in the original public trust decisions of this nation. *See Illinois Central,* 146 U.S. at 452 ("It is a title held in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein . . . ."). Absent public ownership of navigable airspace, this critical resource could have been the subject of private monopolies. In *United States v. Causby,* the Supreme Court warned, "To recognize private claims to the airspace would clog these highways, seriously interfere with their control and development in the public interest, and transfer into private ownership that to which *only the public has a just claim.*" 328 U.S. 256, 261 (1946) (emphasis added). Not surprisingly, given the crucial public interest in air, numerous state constitutions and codes explicitly recognize air as part of the *res* of the public trust.[9] Moreover, federal statutory law already includes air as a trust asset for which the federal government, states, and tribes may gain recovery of natural resource damages.[10]

Never before has the nation's climate system been threatened. But throughout history, law has evolved as courts respond to unforeseen, often urgent, circumstances. The same fiduciary principles that have informed all historic public trust cases apply with force to protect the atmosphere. As the Supreme Court said in applying the public trust to an unprecedented set of

---

[8] Torres, *Who Owns the Sky?, supra,* at 529.

[9] *See, e.g., Her Majesty v. City of Detroit,* 874 F.2d 332, 337 (6th Cir. 1989) (citing a Michigan statute that codifies the public trust to include "air, water, and other natural resources" and Mich. Const. art. IV, stating, "The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people."); Haw. Const., art. XI, § 1 (stating, "All public natural resources are held in trust by the State for the benefit of the people," and "the State and its political subdivisions shall conserve and protect Hawaii's . . . natural resources, including land, water, air, minerals and energy resources . . . ."); R.I. Const., art. I, § 17 (duty of legislature to protect air), interpreted as codification of Rhode Island's public trust doctrine in *State ex. Rel. Town of Westerly v. Bradley,* 877 A.2d 601, 606 (R.I. 2005); *Nat'l Audubon Soc'y v. Superior Ct. of Alpine Cty,* 658 P.2d 709, at 718-720 ("purity of the air" protected by the public trust).

[10] *See* 42 U.S.C. § 9601 (CERCLA)(2006) (defining air as among the natural resources subject to trust claims for damages).

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
TELEPHONE (541) 484-2434

PAGE 17 OF 23 –BRIEF FOR AMICUS CURIAE LAW PROFESSORS – EXHIBIT A
CASE NO.: 3:11-CV-02203 EMC

circumstances in *Illinois Central*:

> We cannot, it is true, cite any authority where a grant of this kind has been held invalid, for we believe that no instance exists where the harbor of a great city and its commerce have been allowed to pass into the control of any private corporation. But the decisions are numerous which declare that such property is held by the state, by virtue of its sovereignty, in trust for the public.

*Illinois Central*, 146 U.S. at 455. Although conditions change with time, the basic task and the principles that inform judicial discretion remain constant. This court possesses solid legal rationale upon which to base recognition of the atmosphere as a vital and appropriate asset falling within the scope of the public trust doctrine.

## IV.    THE FEDERAL TRUST RESPONSIBILITY

As an inherent attribute of sovereignty, the public trust doctrine applies to both the state and federal governments. It is true that most of the public trust cases in the United States have involved states, but that is because states have historically been the primary managers of waters, wildlife, and other resources.[11]   The doctrine is not in any way exclusively a state law doctrine; indeed, the Supreme Court's lodestar *Illinois Central* decision cited no state law in concluding the Chicago harbor was a subject of the public trust.

History demonstrates that the trusteeship over lands inherited by the states was quintessentially national in character. The English Crown, a national sovereign, originally held the submerged lands in trust for the people under English common law, as recognized by the Supreme Court:

> When the 13 Colonies became independent from Great Britain, they claimed title to the lands under navigable waters within their boundaries as the sovereign successors to the English Crown. Because all subsequently admitted States enter the Union on an '*equal footing*' with the original 13 states, they too hold title to the land under navigable waters within their boundaries upon entry into the Union.

---

[11] *See* Tunipseed, *et al., supra*, at 10 ("[N]o one has forced the issue at the national level in the way that it has been pushed at the state level.") (remarks of Patrick Parenteau).

Johnson Johnson
Larson & Schaller
Suite 1050
975 Oak Street
Eugene, OR 97401
TELEPHONE: (541) 484-2434

1   *Division of State Lands v. United States*, 482 U.S. 193, 195-96 (1987). Because the states created

2   the federal government through delegation, the federal role under the public trust doctrine cannot

3   yield "greater rights and fewer limitations (towards the management and protection of trust

4   resources) than the entities that created it." Zygmunt J.B. Plater *et al.*, ENVIRONMENTAL LAW AND

5   POLICY: NATURE, LAW, AND SOCIETY 1103 (Erwin Chemerinsky *et. al.*, eds., 3rd ed. 2004).

6

7       In the most extensive modern analysis of the federal trust role to date, the federal district

8   court of Massachusetts unequivocally found the trust applicable to the federal government.

9   Exploring the dual federal and state roles in the context of tidelands, the court concluded: "Since the

10  trust impressed upon this property is governmental and administered jointly by the state and federal

11  governments by virtue of their sovereignty, neither sovereign may alienate this land free and clear

12  of the public trust. . . ." *1.58 Acres of Land*, 523 F. Supp. at 124. The court made clear that the

13  federal and state governments are "co-trustees" of resources, and that the "dual sovereignty"

14  envisioned by the Constitution gives rise to distinct, but co-existing, roles:

15

16       This formulation recognizes the division of sovereignty between the state and federal
         governments [of] those aspects of the public interest in the tideland and the land below the
17       low water mark[.] [sic] [Those] that relate to the commerce and other powers delegated to
         the federal government are administered by Congress in its capacity as trustee of the jus
18       publicum, while those aspects of the public interest in this property that relate to
         nonpreempted subjects reserved to local regulation by the states are administered by state
19       legislatures in their capacity as co-trustee of the jus publicum.

20  *Id.* at 123.

21       The federal trust comes into play where there are distinctly national interests in a resource,

22  as there decidedly are in the case of air and atmosphere, a resource that transcends state borders.

23  The national character of the resources under the public trust obliges the sovereign to administer

24  this trust "for the benefit of the whole people." *Utah Division of State Lands*, 482 U.S. 193, 196

25  (1987). Early cases clearly identify the atmosphere as a part of the public trust property over which

26

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
TELEPHONE: (541) 484-
2434

the federal government has implied sovereign duties. For example, in *United States v. Causby,* the

Supreme Court identified Congress as creating a "public right of freedom of transit in air

commerce." 328 U.S. at 260. The majority characterized the air as a "public highway" and stated:

> Were that not true, every transcontinental flight would subject the operator to countless
> trespass suits. Common sense revolts at the idea. To recognize such private claims to the
> airspace would clog these highways, seriously interfere with their control and development
> in the public interest, and transfer into private ownership that to which only the public has a
> just claim.

*Id.* at 268. Justice Black in dissent similarly affirmed the public's interest in the airways, noting its

similarity to the public easement in navigable waters held by the United States. *Causby,* 328 U.S. at

271, n.3.   And indeed, the national interest in atmospheric resources is plainly obvious by the

federal government's own ratification of the United Nations Framework Convention on Climate

Change in 1992, which declared a universal trust responsibility among nations on Earth to "protect

the climate system for the benefit of present and future generations of humankind."[12]

The atmosphere is a natural resource similar in kind to others the federal government has a

trust obligation to protect.   In *Alabama v. Texas,* Justice Douglas explained the federal sovereign

trust involving the nation's coastline in words that equally well describe the trust over the nation's

air and atmosphere:

> [W]e are dealing here with incidents of national sovereignty. The marginal sea is not
> an oil well; it is more than a mass of water; it is a protective belt for the entire Nation
> over which the United States must exercise exclusive and paramount authority. The
> authority over it can no more be abdicated than any of the other great powers of the
> Federal Government. It is to be exercised for the benefit of the whole. . . . . Could
> Congress cede the great Columbia River or the mighty Mississippi to a State or a
> power company? I should think not. For they are arteries of commerce that attach to
> the national sovereignty and remain there until and unless the Constitution is
> changed. What is true of a great river would seem to be even more obviously true of
> the marginal sea. For it is not only an artery of commerce among the States but the
> vast buffer standing between us and the world.

374 U.S. 272, 282 (1954).

---

[12] United Nations Framework Convention on Climate Change, S. Treaty Doc. No. 102–38, art. 3,

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
ELEPHONE (541) 484-
2434

Some years later, in *In re Complaint of Steuart Transportation Co.*, a federal district court recognized the right of the federal government to recover damages for destroyed migratory waterfowl under a public trust theory. 495 F. Supp. 38, 40 (E.D. Va. 1980). Congress, in a number of federal statutes, also affirmed the federal government as trustee of natural resources. For example, the National Environmental Policy Act, applicable to all federal agencies, declares in its opening section a national duty to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." 42 U.S.C. § 4331(b)(1). Other statutes impose a duty on federal agencies to seek compensation for damage to public trust assets.[13]

The Government's relies on inapposite cases. *New York v. DeLyser*, for example, primarily held that the State of New York failed to state a federal claim under the public trust doctrine. 759 F. Supp. 982, 990 (W.D.N.Y. 1991). This is hardly surprising: the states have historically been the primary managers of waters, wildlife, and other resources, and most of the public trust cases in the United States have involved the states.[14] However, this is no jurisprudential bar to extending the obligations and duties inherent in the sovereign to the federal government.

### CONCLUSION

The public trust doctrine plainly applies to protect the nation's air and atmosphere, both of which are crucial resources needed for the survival and welfare of present and future generations. The federal government thus owes a fiduciary obligation under the public trust doctrine to take immediate action to abate dangerous greenhouse gas pollution that threatens the air, atmosphere,

---

p. 1 (1992), *available at* http://unfccc.int/resource/docs/convkp/conveng.pdf.
[13] *See, e.g.*, CERCLA, 42 U.S.C. § 9607(f)(1) (2004) (liability for natural resources "shall be to the United States Government, and to any State . . . and to any Indian tribe for natural resources belonging to, managed by, controlled by, or appertaining to such tribe, or held in trust for the benefit of such tribe . . . ."); Oil Pollution Act of 1990 (OPA), 33 U.S.C. § 2706(a) (2004) (similar); Clean Water Act, 33 U.S.C.A. § 1319 (2004) (similar); Marine Protection, Research and Sanctuaries Act (MPRSA), 16 U.S.C.A. § 1375 (2004) (similar).

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
TELEPHONE (541) 484-2434

1  and climate system.

2       Respectfully submitted this ___7th___ day of December, 2011.

3                           **JOHNSON JOHNSON LARSON AND SCHALLER, PC**

4

5       By

6                           JENNIFER J. MIDDLETON (Ca. Bar No. 178546)
                            *Counsel for Amicus Curiae Law Professors*

7  **On behalf of:**

8  *Craig Anthony (Tony) Arnold,* Boehl Chair in Property and Land Use, Professor of Law &
9  Affiliated Professor of Urban Planning, and Chair of the Center for Land Use and Environmental
   Responsibility, University of Louisville Brandeis School of Law

10 *Dr. Deepa Badrinarayana*, Associate Professor of Law, Chapman University School of Law

11 *Michael Blumm*, Jeffrey Bain Faculty Scholar & Professor of Law, Lewis and Clark Law School

12 *Maxine Burkett,* Associate Professor of Law and Director, Center for Island Climate Adaptation and
13 Policy, William S. Richardson School of Law, University of Hawai'i, Manoa

14 *Federico Cheever*, Professor & Associate Dean for Academic Affairs, University of Denver, Sturm
   College of Law

15 *Karl S. Coplan*, Professor of Law and Co-Director, Environmental Litigation Clinic, Pace Law
16 School

17 *Timothy P. Duane*, Associate Professor, Vermont Law School and Associate Professor of
   Environmental Studies, University of California, Santa Cruz

18 *Eric T. Freyfogle*, Max L. Rowe Professor of Law, University of Illinois College of Law

19 *Alyson C. Flournoy,* UF Research Foundation Professor & Alumni Research Scholar, University of
20 Florida Levin College of Law, University of Florida Levin  College of Law

21 *Jacqueline Hand,* Professor of Law, University of Detroit Mercy Law School

22 *Ryke Longest*, Director, Duke Environmental Law and Policy Clinic, Duke University School of
   Law

23 *James R. May*, Professor of Law and Co-Director, Environmental Law Center, Widener University

24 *Patrick Parenteau*, Professor of Law and Senior Counsel, Environmental and Natural Resources
25 Law Clinic, Vermont Law School

26

---

[14] *See*  Turnipseed, *et al., supra* note 17.

Johnson Johnson
Larson & Schaller
975 Oak Street
Suite 1050
Eugene, OR 97401
TELEPHONE (541) 484-
2434

1    *Zygmunt Jan Broël Plater*, Professor of Law, Boston College Law School

2    *William Rodgers*, Stimson Bullitt Professor of Law, University of Washington School of Law

3    *Joseph L. Sax*, James H. House and Hiram H. Hurd Professor of Environmental Regulation, Emeritus, Boalt Hall School of Law, University of California Berkeley

4

5    *James Gustave Speth*, Professor of Law, Vermont Law School

      *David Takacs*, Associate Professor of Law, University of California, Hastings College of the Law

6

7    *Gerald Torres*, Bryant Smith Chair in Law, University of Texas at Austin School of Law

8    *Burns H. Weston*, Bessie Dutton Murray Distinguished Professor of Law Emeritus, Senior Scholar, UI Center for Human Rights (UICHR) and Co-Director, Commons Law Project (CLP), The University of Iowa

9

10   *Charles Wilkinson,* Distinguished Professor and Moses Lasky Professor of Law, University of Colorado Law School

11   *Mary Christina Wood*, Philip H. Knight Professor of Law and Faculty Director, Environmental and Natural Resources Law Program, University of Oregon School of Law

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Johnson Johnson
Larson & Schailer
975 Oak Street
Suite 1050
Eugene. OR 97401
ELEPHONE (541) 484-
2434

PAGE 23 OF 23 –BRIEF FOR AMICUS CURIAE LAW PROFESSORS – EXHIBIT A
CASE NO.: 3:11-CV-02203 EMC