## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **ALEC L.** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 1:11-cv-02235 (RLW)** |
| | ) | |
| **LISA P. JACKSON, in her official capacity as** | ) | |
| **ADMINISTRATOR of the** | ) | |
| **UNITED STATES ENVIRONMENTAL** | ) | |
| **PROTECTION AGENCY,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

### AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Allison D. Wood (D.C. Bar No. 466928)
Aaron M. Flynn (D.C. Bar No. 488531)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
Phone:  (202) 955-1500
Fax:  (202) 778-2201
awood@hunton.com
flynna@hunton.com
*Counsel for Amici Curiae Law Professors*

Dated:  April 23, 2012

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................. ii

INTERESTS OF AMICI CURIAE ....................................................................................... 1

INTRODUCTION ................................................................................................................. 3

ARGUMENT ........................................................................................................................ 4

I.      There Is No Federal Public Trust Doctrine. ..................................................... 5

II.     Even if a Federal Public Trust Doctrine Does Exist, Any Such Federal
Common Law Cause of Action Is Now Displaced ........................................ 9

III.    Even if There Is a Federal Public Trust Doctrine That Has Not Been
Displaced, It Would Not Require the Federal Government to Protect the
Climate. ...................................................................................................... 12

        A.    Assuming the Public Trust Doctrine Applies Federally, Has Not
Been Displaced, and Imposes Affirmative Resource Management
Obligations on the Federal Government, It Would Still Not Apply
in this Context. ................................................................................. 13

        B.    The Public Trust Doctrine Does Not Authorize the Regulation of
Greenhouse Gas Emissions. ............................................................ 17

CONCLUSION .................................................................................................................... 19

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alabama v. Texas*, 347 U.S. 272 (1954) ................................................................... 9

*Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527 (2011) ................................... 9, 10, 11, 12

*City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ................................................. 10, 12

*Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d 1077 (D.C. Cir. 1984) .......................... 7

*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) ....................................................... 5

*Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907) .......................................... 18, 19

*Illinois v. Milwaukee*, 406 U.S. 91 (1972) ................................................................ 10

*Illinois Central R.R. v. Illinois*, 146 U.S. 387 (1892) ........................................... 7, 8, 14, 17, 18

*Lake Mich. Fed'n v. Army Corps of Eng'rs*, 742 F. Supp. 441 (N.D. Ill. 1990) .......... 7

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................................ 9

*New York v. DeLyser*, 759 F. Supp. 982 (W.D.N.Y. 1991) ...................................... 7

*O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994) ................................................... 15

*Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469 (1988) .................................... 15

*PPL Montana, LLC v. Montana*, 132 S. Ct. 1215 (2012) ......................................... 6, 12, 13

*Sierra Club v. Andrus*, 487 F. Supp. 443 (D.D.C. 1980) ........................................ 7

*Sierra Club v. Block*, 622 F. Supp. 842 (D. Colo. 1985) ........................................ 12

*St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515 (8th Cir. 1999) .......................... 7

*United States v. 1.58 Acres of Land*, 523 F. Supp. 120 (D. Mass. 1981) ................... 8, 9

*United States v. Causby*, 328 U.S. 256 (1946) ....................................................... 17, 18

*Wisconsin v. Baker*, 698 F.2d 1323 (7th Cir.) ....................................................... 7

---

\* Authorities upon which we chiefly rely are marked with asterisks.

## STATE CASES

*Nat'l Audubon Soc'y v. Superior Court of Alpine Cnty.*, 658 P.2d 709 (Cal. 1983) .................. 15

*Van Ness v. Borough of Deal*, 393 A.2d 571 (N.J. 1978) ......................................................... 15

## STATE CONSTITUTIONS

HAW. CONST. art. XI, § 1 .................................................................................................... 14

PA. CONST. art. I, § 27 ........................................................................................................ 14

## FEDERAL REGISTER

74 Fed. Reg. 66,496 (Dec. 15, 2009)................................................................................... 11

75 Fed. Reg. 25,324 (May 7, 2010)..................................................................................... 11

75 Fed. Reg. 31,514 (June 3, 2010)..................................................................................... 11

76 Fed. Reg. 57,106 (Sept. 15, 2011) .................................................................................. 11

77 Fed. Reg. 22,392 (Apr. 13, 2012).................................................................................... 11

## MISCELLANEOUS

Baer, Susan D., Comment, *The Public Trust Doctrine  –  A Tool to Make Federal
    Administrative Agencies Increase Protection of Public Land and Its
    Resources*, 15 B.C. ENVTL. AFF. L. REV. 385 (1988) ...................................................... 4

Huffman, James L., *A Fish Out of Water:  The Public Trust Doctrine in a
    Constitutional Democracy*, 19 ENVTL. L. 527 (1989) .................................................... 16

Huffman, James L., *Speaking of Inconvenient Truths – A History of the Public
    Trust Doctrine*, 18 DUKE ENVTL. L. & POL'Y F. 1 (2007) ................................................ 5

Kearney, Joseph D. & Thomas W. Merrill, *The Origins of the American Public
    Trust Doctrine:  What Really Happened in Illinois Central*, 71 U. CHI. L.
    REV. 799 (2004)............................................................................................................ 14

Sax, Joseph L., *The Public Trust Doctrine in Natural Resource Law:  Effective
    Judicial Intervention*, 68 MICH. L. REV. 471 (1970)....................................................... 4

SELVIN, MOLLY, THIS TENDER AND DELICATE BUSINESS:  THE PUBLIC TRUST
        DOCTRINE IN AMERICAN LAW AND ECONOMIC POLICY 1789-1920 (1987) ................... 4, 5

Thompson, Jr., Barton H., *The Public Trust Doctrine:  A Conservative
        Reconstruction & Defense*, 15 SOUTHEASTERN ENVTL. L.J. 47 (2006) ...............13, 16, 18

Turnipseed, Mary, et al., *The Silver Anniversary of the United States' Exclusive
        Economic Zone:  Twenty-Five Years of Ocean Use and Abuse, and the
        Possibility of a Blue Water Public Trust Doctrine*, 36 ECOLOGY L.Q. 1
        (2009)........................................................................................................................ 5

Wilkinson, Charles F., *The Public Trust Doctrine in Public Land Law*, 14 U.C.
        DAVIS L. REV. 269 (1980-1981) ................................................................................ 14

**AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

**INTERESTS OF AMICI CURIAE**

Amici curiae are law professors specializing in environmental law, climate law,
administrative law, and/or the public trust doctrine.  Each has an interest in the status and
development of the law in these areas and in ensuring the accuracy of their presentation before
the courts.  In this regard, amici believe that the questions raised by this case now before the
Court are of the highest importance.  Their individual qualifications are as follows:

Ronald A. Cass is the Dean Emeritus of the Boston University School of Law, where he
was Dean from 1990-2004, former Vice-Chairman and Commissioner of the U.S. International
Trade Commission, Chairman of the Center for the Rule of Law (an independent, non-profit
center of international scholars analyzing rule of law issues), and President of Cass & Associates,
PC (a legal consultancy).  Dean Cass has been a law professor at the University of Virginia and
Boston University, visiting professor at the Université d'Aix-Marseille III, Aix-en-Provence,
France, and visiting professor of Comparative Law at the Université Lyon III, Lyon, France. He
is the author of more than 120 scholarly books and articles, on topics such as climate change law,
administrative law and regulation, and legal process.  He received his B.A. with high distinction
from the University of Virginia and his J.D. with honors from the University of Chicago.

Robert A. Destro is professor of law and is director and founder of the Interdisciplinary
Program in Law & Religion at The Catholic University of America Columbus School of Law.
He joined the faculty in 1982, and served as Interim Dean from 1999-2001.  From 1983 to 1989,
he served as a commissioner on the United States Commission on Civil Rights and led the
commission's discussions in the areas of discrimination on the basis of disability, national origin
and religion.  He served as general counsel to the Catholic League for Religious and Civil Rights

from 1977 to 1982, and as an adjunct associate professor of law at Marquette University from 1978-1982.  From 1975 to 1977, he was engaged in the private practice of law with the law firm of Squire, Sanders & Dempsey in Cleveland, Ohio.  Professor Destro received his B.A. in 1972 from Miami University in Oxford, Ohio, and his law degree in 1975 from the University of California at Berkeley.

Professor James L. Huffman, Dean Emeritus of the Lewis & Clark Law School, is a graduate of Montana State University, the Fletcher School of Law and Diplomacy at Tufts University, and the University of Chicago Law School.  Professor Huffman joined the Lewis & Clark Law School faculty in 1973, was appointed Acting Dean in 1993 and Dean in 1994, and returned to full time teaching in 2006.  He has been a visiting professor at Auckland University in New Zealand, the University of Oregon, the University of Athens in Greece and Universidad Francisco Marroquin in Guatemala.  He was also a fellow at the Humane Studies Institute and a Distinguished Bradley Scholar at the Heritage Foundation.  Professor Huffman serves on the boards of the National Crime Victims Law Institute, the Foundation for Research on Economics and the Environment, the Classroom Law Project, and the Rocky Mountain Mineral Law Foundation.  He is a member and former Chair of the Executive Committee of the Environment and Property Rights Practice Group of the Federalist Society.  He is a member of the Montana Bar Association and is admitted to practice before the United States Court of Appeals for the Federal Circuit and the United States Supreme Court.  He is the author of more than 100 articles and chapters on a wide array of legal topics.  Professor Huffman is a recognized expert on natural resources and environmental law, and, of particular relevance here, is the author of several widely cited scholarly articles on the public trust doctrine.

Jason Scott Johnston is the Henry L. and Grace Doherty Charitable Foundation Professor of Law and the Nicholas E. Chimicles Research Professor in Business Law and Regulation at the University of Virginia School of Law.  Professor Johnston is also the coordinator of the Searle Workshops on Markets and the Environment at the University of Virginia School of Law.  He is the author of recent articles on climate change law and regulation in *Regulation*, *Notre Dame Law Review*, and the *Harvard Environmental Law Review*, and has published dozens of articles on law economics both in law reviews such as the *Yale Law Journal* and peer-edited journals such as the *Journal of Law, Economics and Organization*.

The views expressed herein are those of the amici and do not necessarily represent the views of any group or organization with which any of them are affiliated.

## INTRODUCTION

Plaintiffs allege that the public trust doctrine "requires Defendants … to hold vital natural resources in 'trust' for present and future generations" and that this requirement encompasses an obligation on the part of the federal government "to affirmatively preserve and protect our nation's trust assets," which Plaintiffs assert include the atmosphere and the air, "from damage or loss, and not to use our nation's trust assets in a manner that causes injury to the trust beneficiaries, present and future."  Pls.' Am. Compl. ¶¶ 66, 67, ECF No. 4.  More specifically, Plaintiffs claim the public trust doctrine imposes a fiduciary duty on all branches of the federal government "to restore Earth's climate equilibrium in the time frame scientific analysis deems necessary to avoid catastrophic climate change."  *Id.* ¶ 68.  But, as explained further below, Plaintiffs' claims must fail because there is no federal common law public trust doctrine, and even if such a federal common law doctrine did exist, the federal Clean Air Act has displaced it.

Moreover, even if a federal common law doctrine exists and has not been displaced, the doctrine

does not require the federal government to protect the climate.

## ARGUMENT

For many years, beginning most notably in the modern era with the 1970 publication of

Joseph L. Sax's *The Public Trust Doctrine in Natural Resource Law: Effective Judicial

Intervention*,[1] commentators have argued that the public trust doctrine could be the basis for

correcting what they perceived as inadequate management of various natural resources, including

navigable waterways, wetlands, federal public lands, and most recently, the climate and

atmosphere.  Under the interpretation promoted by Plaintiffs and Amicus Curiae Law Professors

("Plaintiffs' Amici") of the public trust doctrine, both federal and state governments must hold

certain resources in trust for the people, including the atmosphere and the climate, and must

protect and preserve those resources for the public.  Plaintiffs and Plaintiffs' Amici argue that

this Court is empowered to enforce this doctrine and to require federal agencies to manage the

atmosphere and the climate in the manner Plaintiffs and Plaintiffs' Amici believe necessary to

prevent "dangerous greenhouse gas pollution" and its contribution to climate change.  Pls.'

Amici Br. at 6, ECF No. 135.

The concept of the public trust doctrine originated in Roman law[2] and was incorporated

into English common law centuries later.[3]  Traditionally, the doctrine applied to tidelands and

---

[1] 68 MICH. L. REV. 471 (1970).

[2] Susan D. Baer, Comment, *The Public Trust Doctrine - A Tool to Make Federal Administrative Agencies Increase Protection of Public Land and Its Resources*, 15 B.C. ENVTL. AFF. L. REV. 385, 388 (1988); MOLLY SELVIN, THIS TENDER AND DELICATE BUSINESS: THE PUBLIC TRUST DOCTRINE IN AMERICAN LAW AND ECONOMIC POLICY 1789-1920, 1 (1987) ("Selvin").

certain submerged lands,[4] and stood for the proposition that specific usage and access rights, such as fishing and navigation, were preserved for the public.  Once a resource became part of the public trust, the government had the ability to transfer the resource into private ownership but only on the basis that the general public retain a right of access and usage.[5]

The original thirteen colonies adopted English common law, and the public trust duties of the English sovereign became vested in the states.[6]  The doctrine, however, does not arise under federal law, and while it remains an attribute of state law, it does not operate in the manner Plaintiffs or Plaintiffs' Amici suggest.

## I.      There Is No Federal Public Trust Doctrine.

A federal public trust doctrine does not exist and cannot be used as a basis for court-imposed greenhouse gas emission reductions.  As a general matter, federal common law exists in only very limited circumstances.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (holding "[t]here is no federal general common law").  Most courts, including the United States Supreme Court, have rejected assertions that a federal public trust doctrine exists.  And those few court decisions that Plaintiffs and Plaintiffs' Amici cite as supporting a federal public trust doctrine have merely affirmed federal power to regulate natural resources – an entirely different concept than the one Plaintiffs and Plaintiffs' Amici propound here.

---

[3] Mary Turnipseed, et al., *The Silver Anniversary of the United States' Exclusive Economic Zone: Twenty-Five Years of Ocean Use and Abuse, and the Possibility of a Blue Water Public Trust Doctrine*, 36 ECOLOGY L.Q. 1, 10 (2009) ("Turnipseed").

[4] For a comprehensive discussion of the history of the public trust doctrine, *see generally* James L. Huffman, *Speaking of Inconvenient Truths – A History of the Public Trust Doctrine*, 18 DUKE ENVTL. L. & POL'Y F. 1 (2007).

[5] Selvin at 2.

[6] Turnipseed, 36 ECOLOGY L.Q. at 11.

The most recent decision to address whether a federal public trust doctrine exists is the U.S. Supreme Court's ruling in *PPL Montana, LLC v. Montana*, 132 S. Ct. 1215 (2012), where the Court stated definitively that no such doctrine exists.  In that case, the State of Montana sought to obtain compensation for an electric utility's use of riverbeds for its hydroelectric generation facilities.  Whether the state held title to those riverbeds, or if they instead belonged to the federal government and riparian land owners, was the central issue in determining whether Montana was entitled to compensation.  In relevant part, Montana argued that it would "undermine the public trust doctrine" if it were denied title to the riverbeds at issue.  *Id*. at 1234.  In a unanimous opinion, Justice Kennedy explained that Montana's argument was based on a misunderstanding of the doctrine.  *Id*.  The Court held that it was the federal equal-footing doctrine that determines who holds title to riverbeds and that the public trust doctrine had no bearing on the issue.  In reaching this decision, the Court explained that the public trust doctrine is not an element of federal law and that it is not based on the federal Constitution:

> Unlike the equal-footing doctrine, however, which is the *constitutional foundation* for the navigability rule of riverbed title, *the public trust doctrine remains a matter of state law* subject as well to the federal power to regulate vessels and navigation under the Commerce Clause and admiralty power.  While equal-footing cases have noted that the State takes title to the navigable waters and their beds in trust for the public, *the contours of that public trust do not depend upon the Constitution*. Under accepted principles of federalism, the States retain residual power to determine the scope of the public trust over waters within their borders, while federal law determines riverbed title under the equal-footing doctrine.

*Id*. at 1235 (emphases added) (internal citations omitted).  Accordingly, the public trust doctrine is entirely a creature of state law; it cannot be applied against the federal government as Plaintiffs and Plaintiffs' Amici suggest.

The Supreme Court's holding in *PPL Montana* is consistent with the line of cases preceding that decision, including those relied on by Plaintiffs here.  The U.S. Court of Appeals

for the District of Columbia Circuit, for instance, has held that the public trust doctrine "developed almost exclusively as a matter of *state* law" and that the public trust doctrine imposes a "constraint on *states'* ability to alienate public trust lands and as a limitation on uses that interfere with trust purposes." *Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1082-83 (D.C. Cir. 1984) (emphases added); *see also St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515, 521 (8th Cir. 1999); *Sierra Club v. Andrus*, 487 F. Supp. 443, 449 (D.D.C. 1980) ("To the extent that plaintiff's argument advances the proposition that defendants are charged with 'trust' duties distinguishable from their statutory duties, the Court disagrees.  Rather, the Court views the statutory duties previously discussed as comprising all the responsibilities which defendants must faithfully discharge."); *Lake Mich. Fed'n v. Army Corps of Eng'rs*, 742 F. Supp. 441, 446 (N.D. Ill. 1990).  Similarly, in *Wisconsin v. Baker*, 698 F.2d 1323, 1327 (7th Cir.), the U.S. Court of Appeals for the Seventh Circuit concluded that even if the federal government at one time had held resources in a public trust, any such trust obligations were extinguished pursuant to the equal-footing doctrine.  *See also New York v. DeLyser*, 759 F. Supp. 982, 990 (W.D.N.Y. 1991) (holding that "claims relating to the public trust doctrine do not 'arise under' federal law" and that the state's public trust responsibilities are "not … circumscribed by federal common law").

Plaintiffs and Plaintiffs' Amici provide no compelling justification for ignoring this well-established precedent and extending the public trust doctrine to the federal government.  The authorities they cite relate almost entirely to application of the public trust doctrine at the state level.  Plaintiffs' Amici suggest, for instance, that *Illinois Central Railroad v. Illinois*, 146 U.S. 387 (1892), should be read to apply the public trust doctrine beyond the states because the "decision cited no state law in concluding the Chicago harbor was a subject of the public trust." *See, e.g.*, Pls.' Amici Br. at 18.  But that case does not invoke federal common law, and it had no

reason to do so.  On the contrary, it expressly involves the public trust doctrine as applied against the *State* of Illinois.  *Ill. Cent.*, 146 U.S. at 434-35.

Where Plaintiffs' Amici do quote language asserting the existence of the doctrine in the federal context, it is clear that the trust concept at issue is entirely different than the doctrine that has been applied to the states and that Plaintiffs seek to impose on the federal government through this litigation.  Plaintiffs' Amici rely, for instance, on *United States v. 1.58 Acres of Land*, 523 F. Supp. 120 (D. Mass. 1981), which they describe as "the most extensive modern analysis of the federal trust role to date."  Pls.' Amici Br. at 19.  But in that case, the court did not find that the federal government was directly subject to the public trust doctrine.  On the contrary, the court held only that by taking a portion of Massachusetts' submerged lands through the power of eminent domain, the federal government did not destroy the state law-based public trust rights in those submerged lands and that it could not thereafter transfer those lands, free of the public's rights to them, to a private party.  *1.58 Acres of Land*, 523 F. Supp. at 123-24.

Plaintiffs' Amici rely on the following language as support for their argument that the federal government is subject to the public trust doctrine:

> "[T]he commerce and other powers delegated to the federal government are administered by Congress in its capacity as trustee of the jus publicum, while those aspects of the public interest in this property that relate to nonpreempted subjects reserved to local regulation by the states are administered by state legislatures in their capacity as co-trustee of the jus publicum."

Pls.' Amici Br. at 19 (quoting *1.58 Acres of Land*, 523 F. Supp. at 123).  Plaintiffs' Amici omit a crucial footnote from the language they quote, which defines the nature of the federal government's role as follows:

> "The United States holds [such] resources … in trust for its citizens in one sense, but not in the sense that a private trustee holds for a cestui que trust.  The responsibility of Congress is to utilize the assets that come into the hands of the *sovereign in the way that it decides is best* for the Nation."

8

*1.58 Acres of Land*, 523 F. Supp. at 123 n.3 (quoting *Alabama v. Texas*, 347 U.S. 272, 277 (1954) (Reed, J., concurring)) (emphasis added).[7]  Thus, the "public trust" obligations applicable to states are entirely different than any federal government obligations that might exist.  *1.58 Acres of Land*, which Plaintiffs' Amici say is the "most extensive modern analysis" of the federal public trust doctrine, indicates that the federal government has none of the obligations on which Plaintiffs' claims rely.

Plaintiffs and Plaintiffs' Amici cite no valid authority for their argument that there is a federal trust doctrine.  For this reason, Plaintiffs' claims must fail.

## II.     Even if a Federal Public Trust Doctrine Does Exist, Any Such Federal Common Law Cause of Action Is Now Displaced.

Even if there were a federal public trust obligation and even if that obligation could have been properly extended to require federal agencies to regulate greenhouse gas emissions to protect the air and atmosphere, any such federal common law has been displaced.[8]  Plaintiffs cite the Supreme Court's decision in *American Electric Power Co. v. Connecticut*, 131 S. Ct. 2527 (2011) ("*AEP*"), as support for their contentions that:  (1) the courts can fashion federal law; (2) there is federal common law addressing environmental protection; and (3) such federal common

---

[7] Plaintiffs' Amici also cite *Alabama v. Texas* for the proposition that Congress has "paramount authority" over the marginal sea, i.e., the portion of the ocean over which the United States claims sovereignty, and that Congress must exercise that authority "for the benefit of the whole."  347 U.S. at 282.  Once again, however, Plaintiffs' Amici simply disregard the nature of Congress's authority, which as explained above is not similar to that of a private trustee.  Rather, Congress's obligation is to use any public trust assets in whatever manner it decides is best for the country.

[8] *See Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) (holding that the federal Clean Air Act gives the U.S. Environmental Protection Agency ("EPA") authority to regulate greenhouse gas emissions).

law properly addresses air and water in their ambient or interstate aspects.[9]  Pls.' Am. Compl.

¶ 69.  Rather, *AEP* stands for the proposition that the sort of federal common law on which

Plaintiffs wish to rely is no longer available to them – if indeed it ever was.

The U.S. Supreme Court has recognized that "when Congress addresses a question

previously governed by a decision rested on federal common law the need for such an unusual

exercise of lawmaking by the federal courts disappears," and any previously recognized federal

common law claims[10] in that field are displaced.  *City of Milwaukee v. Illinois*, 451 U.S. 304, 314

(1981) ("*Milwaukee II*").  Applying this framework, the *Milwaukee II* Court determined that

Congress' substantial amendments to the federal Clean Water Act displaced all federal common

law claims related to water pollution.

In *AEP*, plaintiffs sought the curtailment of greenhouse gas emissions from major sources

to mitigate climate change based on a theory of federal common law of nuisance.  The Supreme

Court held that if such federal common law existed, it had been displaced by Congress'

enactment of the Clean Air Act.  The Clean Air Act, the Court explained, not only authorizes

EPA to consider and to promulgate greenhouse gas regulations for numerous categories of

sources, but also offers "multiple avenues" by which states and private parties may petition for

rulemaking or seek review of EPA's decisions in federal courts.  *AEP*, 131 S. Ct. at 2530.  As the

Court stated, "[t]he Act itself ... provides a means to seek limits on emissions of carbon dioxide

from domestic power plants – the same relief the plaintiffs seek by invoking federal common

law."  *Id*. at 2530-31.  The Court therefore found "no room for a parallel track."  *Id*. at 2531.

---

[9] Plaintiffs' Amended Complaint refers to *Connecticut, et al. v. American Electric Power*, but it is apparent that they are referring to *AEP*.

[10] *See Illinois v. Milwaukee*, 406 U.S. 91 (1972) ("*Milwaukee I*") (finding common law in limited circumstances); *see also AEP*, 131 S. Ct. at 2535.

There is no room for the parallel track this litigation seeks either.  Indeed, this suit seeks exactly the same outcome – reductions of greenhouse gases through the application of federal common law – that plaintiffs sought in *AEP*.  Plaintiffs' Amici argue that "[j]udicial enforcement of fiduciary obligations is necessary when the political branches abdicate their responsibility to protect the *res* of the trust.  The Obama administration has yet to issue any encompassing rule regulating greenhouse gas emissions under clear authority provided in the Clean Air Act."  Pls.' Amici Br. at 7.  First, this assertion is untrue.  The Obama administration has, in fact, issued rules, unprecedented in scope, regulating greenhouse gas emissions.[11]  That these regulations do not regulate such emissions in precisely the manner Plaintiffs would prefer does not justify resorting to a federal common law remedy.  Second, even if true, whether EPA has used the authority granted to it by Congress under the Clean Air Act is irrelevant to the question of federal common law displacement.  Indeed, the Supreme Court made that very point in *AEP*, when the Court noted that even if EPA failed to issue greenhouse gas regulations, "the federal courts would have no warrant to employ the federal common law of nuisance to upset the agency's expert determination" not to regulate.  131 S. Ct. at 2538-39.

Plaintiffs and Plaintiffs' Amici also assert that the public trust doctrine is fundamentally different than other types of common law, suggesting that it cannot be displaced.  Pls.' Am. Compl. ¶ 137 ("The Public Trust Doctrine is an attribute of sovereignty that cannot be abrogated."); Pls.' Amici Br. at 7 (The public trust doctrine is a "fundamental attribute of sovereignty embedded in the Constitution itself, applicable to both the federal and state

---

[11] *See, e.g.*, 74 Fed. Reg. 66,496 (Dec. 15, 2009) (EPA's greenhouse gas endangerment finding); 75 Fed. Reg. 25,324 (May 7, 2010) (EPA's greenhouse gas emission standards for light-duty vehicles); 75 Fed. Reg. 31,514 (June 3, 2010) (EPA's greenhouse gas "tailoring rule"); 76 Fed. Reg. 57,106 (Sept. 15, 2011) (EPA's greenhouse gas emission standards for medium- and heavy-duty engines and vehicles); 77 Fed. Reg. 22,392 (Apr. 13, 2012) (EPA's proposed greenhouse gas emission standards for electric generating units).

governments."). No basis exists for these assertions. They are flatly contradicted by the Supreme Court's holding in *PPL Montana* that the public trust doctrine has no basis in the federal Constitution, 132 S. Ct. at 1235, and other federal court decisions confirm that the public trust doctrine is a traditional "common law concept," *see, e.g.*, *Sierra Club v. Block*, 622 F. Supp. 842, 866 (D. Colo. 1985). It differs in no fundamental way from other common law causes of action and is subject to displacement as described in *Milwaukee II*.

Federal common law is disfavored and is displaced any time Congress enacts a law addressing a subject that has been the subject of federal common law. *Milwaukee II*, 451 U.S. at 314. The Supreme Court has held that the Clean Air Act addresses the emission of greenhouse gases into the ambient air and that its enactment displaces federal common law addressing that issue. *AEP*, 131 S. Ct. at 2531. The public trust doctrine Plaintiffs seek to impose here is nothing more than federal common law and, because Congress has addressed the subject of Plaintiffs' suit in the Clean Air Act, Plaintiffs' federal common law cause of action, to the extent it ever existed, has been displaced.

### III.    Even if There Is a Federal Public Trust Doctrine That Has Not Been Displaced, It Would Not Require the Federal Government To Protect the Climate.

The public trust doctrine does not provide the remedy Plaintiffs seek in this action. Other than situations where the doctrine has been altered by state law, the doctrine does not apply to the air nor does it impose affirmative management obligations apart from maintaining public access to a particular resource. Any harm potentially posed by greenhouse gas emissions or by climate change is not cognizable under the doctrine. As described further below, Plaintiffs and Plaintiffs' Amici misconstrue the bounds of the public trust doctrine.

A.      **Assuming the Public Trust Doctrine Applies Federally, Has Not Been Displaced, and Imposes Affirmative Resource Management Obligations on the Federal Government, It Would Still Not Apply in this Context.**

Plaintiffs assert that Defendants have violated their public trust doctrine obligations by "failing to protect the atmosphere" and by "allowing it to become polluted with high levels of human-caused [carbon dioxide]."  Pls.' Am. Compl. ¶¶ 145, 147.  Plaintiffs also describe Defendants' alleged inaction as "allowing or facilitating the waste of the atmosphere."  *Id.* ¶ 148.  Plaintiffs' Amici state that "[t]he history, principles, and intent of the public trust doctrine compel this Court's recognition of the atmosphere as one of the crucial assets of the public trust."  Pls.' Amici Br. at 13.  The atmosphere cannot be a trust asset under a federal public trust doctrine, however.  There is "no precedent, in particular, for the extension of the public trust by some courts beyond tidal lands and navigable waterways."[12]  Indeed, the public trust doctrine is particularly ill-suited for application to the atmosphere, as discussed in detail in Section III.B below.  Thus, even if such a doctrine existed, it would not reach the claims Plaintiffs and their Amici press.

Plaintiffs' Amici concede that "the modern climate crisis would have been unimaginable when the U.S. Supreme Court first articulated the public trust as a sovereign obligation…."  *Id.* at 8.  They also argue that the public trust doctrine is "a fundamental attribute of sovereignty embedded in the Constitution itself."  *Id.* at 7.  It is difficult to reconcile how an environmental interest inconceivable in 1892 could have been a fundamental attribute of the Constitution ratified over 100 years earlier, and, as described above, the Supreme Court has clearly stated that the public trust doctrine is a matter of state law that "do[es] not depend upon the Constitution." *PPL Montana*, 132 S. Ct. at 1235.  Moreover, the only sort of public trust responsibilities

---

[12] Barton H. Thompson, Jr., *The Public Trust Doctrine:  A Conservative Reconstruction & Defense*, 15 SOUTHEASTERN ENVTL. L.J. 47, 57 (2006) ("Thompson").

recognized at the time the Constitution was ratified involved the traditional duties contained in

English common law, such as protection of the public's navigation interests and the

governmental duty to refrain from alienating submerged lands, as ultimately described by the

Supreme Court in *Illinois Central*.

*Illinois Central* involved recognition by the Supreme Court of the public trust doctrine at

the state level and involved application of the doctrine to submerged lands beneath the navigable

waters and that resource alone.  *Ill. Cent.*, 146 U.S. at 435.  Indeed, some commentators that

argue in favor of a federal public trust doctrine have concluded that such a doctrine should be

"confined to controversies over lands beneath navigable waters,"[13] and others have argued that

the Court's finding in *Illinois Central* that the title to submerged lands is "different from the title

which the United States hold[s] in the [inland] public lands"[14] amounts to a finding that any

federal public trust doctrine would not operate outside of the submerged lands context.[15]

Plaintiffs' Amici argue that since *Illinois Central*, the scope of the public trust doctrine

has broadened and that it should continue to broaden based, apparently, on evolving assumptions

as to what natural resources present a current subject of concern.  Pls.' Amici Br. at 14-15.

Plaintiffs' Amici suggest that because the scope of the public trust doctrine as a creature of state

law has been further refined by statutes and constitutional provisions,[16] as well as through the

---

[13] Joseph D. Kearney & Thomas W. Merrill, *The Origins of the American Public Trust Doctrine: What Really Happened in Illinois Central*, 71 U. CHI. L. REV. 799, 929 (2004).

[14] 146 U.S. at 452.

[15] Charles F. Wilkinson, *The Public Trust Doctrine in Public Land Law*, 14 U.C. DAVIS L. REV. 269, 273 (1980-1981).

[16] *See e.g.*, HAW. CONST. art. XI, § 1; PA. CONST. art. I, § 27.

decisions of state courts,[17] that this Court is free to follow suit and similarly redefine the scope of

the purported federal public trust doctrine.  Plaintiffs and Plaintiffs' Amici fail to cite a single

example of a court expanding a state public trust doctrine to the atmosphere or the climate.  This

is for good reason; such an expansion would be entirely outside the traditional scope of the

public trust doctrine.  The courts should proceed with extreme caution in expanding the scope of

the public trust doctrine especially in this context, as it would apply the doctrine to a natural

resource that is fundamentally different from the resources to which the doctrine applies.

Plaintiffs' Amici cite legislative acts defining the air or atmosphere as subject to the

state's public trust obligations.  *Id*. at 17 n.9.  The existence of these statutes does not support the

contention, however, that the atmosphere or the climate fall under the common law public trust

doctrine.  On the contrary, it confirms that, in the absence of such a statute redefining the scope

of the public trust, air resources should not be subject to the doctrine.

This view comports with the Supreme Court's holding in *Phillips Petroleum Co. v.*

*Mississippi*, 484 U.S. 469 (1988), where the Court affirmed the authority of the states to define

the scope of the public trust doctrine.  The Court held that each state "[has] the authority to

define the *limits* of the lands held in public trust and to recognize private rights in such lands *as*

*they see fit*."  *Id*. at 475 (emphasis added).  If the states are free to define the "limits" of the

public trust doctrine by statute, it stands to reason that their failure to expand the doctrine would

preclude judicial intervention forcing them to do so.  Such a limit on judicial power is even more

appropriate with respect to the creation of federal common law, which is generally disfavored.

*See, e.g.*, *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994).  And it is all the more

---

[17] *See, e.g.*, *Nat'l Audubon Soc'y v. Superior Court*, 658 P.2d 709, 724 (Cal. 1983); *Van Ness v. Borough of Deal*, 393 A.2d 571, 574 (N.J. 1978).

appropriate given that, as discussed above, Congress has enacted legislation directly addressing the nation's air resources, including greenhouse gas emissions.

Given these circumstances, courts should not expand the public trust beyond its traditional focus on tidal lands and navigable waterways.  As stated by Professor Thompson:

> The public trust addresses the unique public values of such areas and, in particular, the boundary regions of such areas.  Decisions that have expanded the scope of the doctrine beyond the traditional trust assets to such lands and resources as dry-sand beaches fail to appreciate the unique importance of the traditional assets and risk giving courts a roving license to impose their policy views on the democratic branches of government.

Thompson, 15 SOUTHEASTERN ENVTL. L.J. at 69; *see also* James L. Huffman, *A Fish Out of Water: The Public Trust Doctrine in a Constitutional Democracy*, 19 ENVTL. L. 527, 565-68 (1989) (a broadly interpreted public trust doctrine is inconsistent with principles of constitutional democracy and "open[s] the door to dramatic expansion of governmental power with resultant intrusions upon individual rights").

Indeed the resources at issue here – the air and climate – are fundamentally different in nature than the submerged lands protected by the public trust doctrine.  Such lands, if freed from the public trust, would have been subject to the unfettered dominion of the states; a single sovereign could have destroyed the public's right to use and access the resource.  As such, the doctrine reasonably imposes a protection obligation on that single sovereign, defining its obligation to its citizens.  The atmosphere and climate, however, cannot be controlled by a single sovereign entity.  Those resources are shared by the world and subject to the control of all of the world's governments.  No single sovereign can protect the atmosphere or the climate over its lands independently.  As such, the public trust doctrine could not, even if it were applied in the manner Plaintiffs seek, protect these resources in the manner Plaintiffs demand.  This fact in and of itself counsels against the expansion of the doctrine in this manner.

16

Finally, Plaintiffs' Amici cite *United States v. Causby*, 328 U.S. 256, 260 (1946), as finding that Congress created a "public right of freedom of transit in air commerce," and that this "clearly identif[ies] the atmosphere as a part of the public trust property over which the federal government has implied sovereign duties."  Pls.' Amici Br. at 19-20.  Plaintiffs' Amici misread this decision.  In *Causby*, the Court notes that Congress claimed the right to regulate the nation's air space, that Congress granted any U.S. citizen the right of freedom of transit in air commerce, and that individual private ownership of the atmosphere extending from individual ownership of land to the air column above that land would not serve the public interest.  328 U.S. at 260-61. The Court goes on, however, to state that the issue of whether air space can be privately owned "does not control the present case."  *Id*. at 261.  Thus, whatever the Court may have said on the issue, it was not an essential holding of the case and is not controlling now.  Regardless, the Court's pronouncements on these issues do not establish that the atmosphere is covered by a federal public trust doctrine.  Rather, the opinion at most can be read as affirming congressional authority to regulate use of the nation's air space for air commerce purposes, and airborne navigation rights have nothing to do with climate change.  *Causby* certainly does not establish that the federal government has an ongoing duty to manage greenhouse gas emissions.

**B.    The Public Trust Doctrine Does Not Authorize the Regulation of Greenhouse Gas Emissions.**

As described above, in *Illinois Central*, the Supreme Court held that the submerged lands beneath Lake Michigan could not be granted to a private entity because the public trust doctrine prohibited Illinois from making such a transfer.  146 U.S. at 452-53.  Instead, the state was required to hold these submerged lands "in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties."  *Id*. at 452.  Thus, the public trust

doctrine prohibited state action that would have abdicated the state's control over the state's submerged lands "so as to leave them entirely under the use and control of private parties." *Id.* at 453. State action falling short of that measure is entirely consistent with the Supreme Court's *Illinois Central* decision and, therefore, with a state's public trust doctrine responsibilities. *See* Thompson, 15 SOUTHEASTERN ENVTL. L.J. at 61 ("the public trust doctrine speaks only against taking development or privatization to an excess").

The cases and authorities cited by Plaintiffs' Amici only confirm the limited scope of the obligations the public trust doctrine imposes when it does apply. Plaintiffs' Amici note, for instance, that the air is navigable and that private claims to the airspace would clog the airways, "seriously interfere with their control and development in the public interest, and transfer into private ownership that to which only the public has a just claim." *Causby*, 328 U.S. at 261. The fact that airspace is navigable, however, does not establish that greenhouse gas emission reductions could be imposed under the public trust doctrine. On the contrary, the brief of Plaintiffs' Amici confirms, as does the case law addressing submerged lands and navigable waters, that even if the public trust doctrine does apply, it would be implicated only by a transfer of ownership rights or by some other action allowing interference with the public's use of the atmosphere.[18] Emissions of greenhouse gases have neither of these effects.

Plaintiffs seek a fundamentally different remedy than the one the public trust doctrine could properly offer. They seek to prevent what they call the "degradation" of the atmosphere.[19]

---

[18] We assume here, for the sake of argument, that the public trust extends to the atmosphere. This position, however, is inconsistent with the better view of the law, as discussed above.

[19] Plaintiffs' Amici cite *Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907), as support for the notion that a state's sovereign property interests include air and imply that this case supports the argument that the public trust doctrine can be used to order emission reductions. This case is of no use to Plaintiffs' claims. *Tennessee Copper* involved a challenge

Pls.' Amici Br. at 15.  Yet the emission of greenhouse gases does not impair the public's ability

to make use of the atmosphere or to access it.  In fact, the emission of greenhouse gases by

members of the public – automobile drivers, electricity generators, industry, and nearly every

member of the public from the beginning of time – is just the sort of public interest that the

public trust doctrine seeks to protect.  Truthfully, Plaintiffs seek to regulate or curtail the public's

use of the atmosphere; the federal government has already begun that effort.  Because the public

interest that the public trust doctrine seeks to protect is not implicated by the actions Plaintiffs

seek to curtail, they have not stated a viable cause of action.

## CONCLUSION

There is no public trust doctrine applicable to the federal government, certainly not one

that would require the reduction of greenhouse gas emissions in the United States to address a

global climate phenomenon.  Moreover, even if such a doctrine could have been said to exist at

one time, it has now been displaced by congressional action to regulate greenhouse gas

emissions under the Clean Air Act.  Plaintiffs have, therefore, failed to state a claim, and their

action must be dismissed.

---

to transboundary air pollution between two states.  The Supreme Court ordered abatement of this
pollution but did so under a federal common law theory of nuisance.  The case has no bearing on
the scope of obligations and protections required under the public trust doctrine.  Further, as
described below, the Supreme Court has determined that Congress displaced the federal common
law of nuisance with respect to greenhouse gases and other air pollutants regulated under the
Clean Air Act.  Thus, *Tennessee Copper* provides no support for a remedy of any kind.

Respectfully submitted,

 /s/ Allison D. Wood
Allison D. Wood (D.C. Bar No. 466928)
Aaron M. Flynn (D.C. Bar No. 488531)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
Phone:  (202) 955-1500
Fax:  (202) 778-2201
awood@hunton.com
flynna@hunton.com

Dated:  April 23, 2012                              *Counsel for Amici Curiae Law Professors*

## CERTIFICATE OF SERVICE

I hereby certify that one copy of the foregoing Amicus Curiae Brief of Law Professors in Support of Defendants' Motion To Dismiss has been served electronically using the Court's ECF email address this 23rd day of April 2012 on each of the following counsel:

Tanya Sanerib
Crag Law Center
917 SW Oak Street
Suite 417
Portland, OR 97205

Philip L. Gregory
Cotchett, Pitre & McCarthy
840 Malcolm Road
Burlingame, CA 94010

Martin F. McDermott
U.S. Department of Justice
ENRD/EDS
601 D Street, N.W.
Washington, D.C. 20004

Theodore Hadzi-Antich
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814

Julia A. Olson
Wild Earth Advocates
2985 Adams Street
Eugene, OR 97405

Thomas J. Beers
Beers Law Offices
234 East Pine Street
Missoula, MT 59807-7968

David T. Buente
Timothy K. Webster
James R. Wedeking
1501 K Street, N.W.
Washington, D.C. 20005

Paige M. Tomaselli
Center for Food Safety
303 Sacramento Street
2nd Floor
San Francisco, CA 94111


    /s/ Allison D. Wood